1997-NMSC-059

950 P.2d 776

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Mario Arthur BACA, Defendant–
Appellant.**

**No. 23332.**

Supreme Court of New Mexico.

Nov. 13, 1997.

Phyllis H. Subin, Chief Public Defender, Christopher Bulman, Assistant Appellate Defender, Santa Fe, for Defendant–Appellant.

Tom Udall, Attorney General, William McEuen, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee.

## OPINION

MINZNER, Justice.

{1} Defendant Mario Baca appeals from his convictions of aiding and abetting first-degree, depraved-mind murder contrary to NMSA 1978, § 30–2–1(A)(3) (1994) and NMSA 1978, § 30–1–13 (1972), and of conspiracy to commit depraved-mind murder contrary to NMSA 1978, § 30–28–2(B)(1) (1979) and Section 30–2–1(A)(3). We have jurisdiction over the direct appeal pursuant to Rule 12–102(A)(1) NMRA 1997.

{2} On appeal, Baca argues that: (1) there was insufficient evidence to support either of his convictions; (2) he was denied effective assistance of counsel because his trial attorney concluded there was no basis for an instruction on lesser included offenses; (3) the trial court erred when it read two notes from jurors and communicated with a juror outside Baca's presence; (4) the instruction on conspiracy to commit depraved-mind murder failed to include an essential element of the crime; and (5) prosecutorial misconduct during voir dire and closing argument deprived him of a fair trial. We hold that: (1) there was sufficient evidence to

support the conviction for depraved-mind murder; (2) Baca has not made a prima facie showing that his counsel was ineffective; and (3) the trial court did not err in its contacts with jurors. We also hold that (4) the instruction on conspiracy lacked an essential element; but because conspiracy to commit depraved-mind murder is not a valid charge, the conviction for conspiracy must be reversed and the charge dismissed rather than retried. Finally, we hold that (5) the prosecutor's remark during voir dire was proper, and that the remark during closing argument was improper, but Baca has not established reversible error.

{3} We reverse the conviction for conspiracy to commit depraved-mind murder and we remand with instructions to dismiss that charge. We affirm Baca's conviction for aiding and abetting depraved-mind murder.

## I.

{4} Shortly before midnight on December 13, 1994, Ricky Comingo was driving in an Albuquerque residential area near his home when he was killed by a bullet fired from another car. It is undisputed that Sebastian Eccleston fired the fatal shot, and that Baca was driving the car from which Eccleston fired.

{5} That night, Baca was driving with three friends, including Eccleston, after an evening of drinking and playing pool. As they approached the intersection of Lomas and Chelwood, Baca was driving about forty to fifty miles per hour. Comingo had stopped at that intersection. His friend, Larry Betancourt, was his only passenger. As the light changed and Comingo began to turn, Baca came up very close behind and followed Comingo's car at a distance of about five feet; his bright lights illuminated the interior of Comingo's car. Although Comingo sped up and drove evasively for several blocks, Baca's car closed quickly to within a quarter of a car length behind Comingo's car. Eccleston fired several shots in rapid succession, hitting Comingo in the head. Betancourt gained control of the car, drove to Comingo's home nearby, and called 911. Comingo died at the hospital.

{6} Several days later, Eccleston was arrested for the murder. The State also charged Baca with aiding and abetting deliberate-intent, first-degree murder, and conspiracy to commit deliberate-intent murder; and in the alternative, with aiding and abetting depraved-mind murder, and conspiracy to commit depraved-mind murder.

{7} John Bacon, who had been a passenger in Baca's car that night, testified at trial for the State as a hostile witness. He stated that, while Baca was driving fast and running red lights, Eccleston had his gun in the car, had a bag of ammunition in his lap, and fired his gun out of the car window into the air several times before they reached the intersection. Bacon stated that he knew during the pursuit that Eccleston had his gun out and was going to shoot at the other car. According to Bacon's testimony, which Baca disputes, when Eccleston fired at the car, Baca laughed and said to Eccleston, "I thought you were just shooting for the tires."

{8} Baca, on the other hand, testified at trial that "all this was like a traffic dispute." He stated that he thought he rear-ended the other car at the intersection, and chased the car to get the driver to stop, exchange insurance information, and assess any damage. According to Baca, Eccleston suddenly pulled out a gun and fired several shots in rapid succession at the other car. Baca wanted to stop, but Eccleston told him to drive on. Baca testified that he did not help Eccleston get in position to shoot and that, although he knew Eccleston had the gun with him, he never actually saw Eccleston fire the gun. He stated that he had not intended for anyone to get shot, and he denied that he laughed or said anything about shooting for tires. He testified that Eccleston "did it all on his own."

{9} The jury convicted Baca of the alternative charges. He was sentenced to life imprisonment for the crime of aiding and abetting depraved-mind murder, as provided in NMSA 1978, § 31–18–14 (1993), and to nine years for the crime of conspiracy to commit depraved-mind murder, as provided in NMSA 1978, § 31–18–15(A)(3) (1994) and Section 30–28–2(B)(1). The trial court or-

dered him to serve the sentences consecutively.

## II.

{10} Baca first contends that there was insufficient evidence to support his conviction for aiding and abetting depraved-mind murder. He contends there was no evidence that he shared Eccleston's purpose or intent in shooting into the car Comingo was driving. He argues that Comingo was killed by a shot into the car and that there is no evidence Baca aided and abetted shooting into the car. *Cf. State v. Hernandez,* 1994 NMSC 043, 117 N.M. 497, 499, 873 P.2d 243, 245 (holding that the State failed to prove depraved-mind murder because the "depraved-mind action of the Defendant *did not proximately cause the victim's death*" (emphasis added)). Baca reasons on appeal that the evidence only showed that he knew that Eccleston was shooting at the tires of the car. He further reasons that shooting at tires is not an act that shows a "depraved mind." Based on this analysis, he argues that there is insufficient evidence to support either the conviction of depraved-mind murder or the conviction of conspiracy to commit depraved-mind murder.

{11} Baca also argues that his counsel provided ineffective assistance because the record indicates that he agreed with the prosecutor in advising the trial court judge on lesser included offenses. He suggests that an instruction on aiding and abetting second-degree murder contrary to NMSA 1978, § 30–2–1(B) (1994), or on aiding and abetting the crime of shooting at or from a motor vehicle contrary to NMSA 1978, § 30–3–8(B) (1993), was appropriate, that his counsel erred in concluding otherwise, and that his counsel's error was prejudicial.

{12} We disagree with both arguments. We hold that sufficient evidence exists to support Baca's conviction as an accomplice based on evidence that he shared Eccleston's purpose in shooting at the driver. *See generally State v. Brown,* 1996 NMSC 073, ¶¶ 15–34, 122 N.M. 724, 727–34, 931 P.2d 69, 72–79 (discussing the mens rea requirement for depraved-mind murder, *State v. Ibn Omar–Muhammad,* 102 N.M. 274, 277–78, 694 P.2d

922, 925–26 (1985) and *State v. Johnson,* 103 N.M. 364, 368, 707 P.2d 1174, 1178 (Ct.App. 1985)). We also hold that Baca has failed to make a prima facie showing of ineffective assistance.

### A. SUFFICIENCY OF THE EVIDENCE TO SUSTAIN CONVICTION FOR AIDING AND ABETTING FIRST–DEGREE, DEPRAVED–MIND MURDER.

{13} The State must offer sufficient evidence to prove each element of the crime charged, beyond a reasonable doubt. *See generally State v. Garcia,* 1992 NMSC 046, 114 N.M. 269, 274, 837 P.2d 862, 867 (quoting *Jackson v. Virginia,* 443 U.S. 307, 317–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979)). The State's obligation to do so arises from the constitutional requirement of due process. *Id.* The evidentiary burden imposed on the State as a matter of due process is the production of evidence into the record, from which a rational fact-finder could find the facts necessary to support each element of the crime charged. "This does not involve substituting the appellate court's judgment for that of the jury in deciding the reasonable-doubt question, but it does require appellate court scrutiny of the evidence and supervision of the jury's fact-finding function to ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *Garcia,* 1992 NMSC 046, 114 N.M. at 274, 837 P.2d at 867.

{14} In reviewing for sufficient evidence to support a conviction, we apply a time-honored, three-part test:

> 1) that substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2) that on appeal, all disputed facts are resolved in favor of the successful party, with all reasonable inferences indulged in support of the verdict, and all evidence and inferences to the contrary discarded; and 3) that although contrary evidence is presented which may have supported a different verdict, the appellate court will not weigh the evidence or foreclose a finding of substantial evidence.

*State v. Lujan,* 103 N.M. 667, 669, 712 P.2d 13, 15 (Ct.App.1985). The first part of this test paraphrases the evidentiary burden imposed on the State as a matter of constitutional due process. The second and third parts of the test reflect a traditional view of the role of an appellate court in reviewing the results achieved at trial, whether the matters tried were civil or criminal. *See, e.g., Sanchez v. Homestake Min. Co.,* 102 N.M. 473, 476, 697 P.2d 156, 159 (Ct.App. 1985). "It is then through this small aperture called appellate review that we examine the evidence." *Id.*

### 1. The State's Burden in Proving Accessory Liability.

{15} Baca's guilt as an accessory arises not only from his own actions but also from those actions that he "helped, encouraged or caused." *See* UJI 14–2822(3) NMRA 1997 ("Aiding or abetting; accessory to crime other than attempt and felony murder."). The State must produce evidence that would satisfy a rational fact-finder that Baca shared Eccleston's purpose and design. *See State v. Ortega,* 77 N.M. 7, 17, 419 P.2d 219, 227 (1966) (holding there must be a "community of purpose and partnership in the unlawful undertaking"); *State v. Luna,* 92 N.M. 680, 683, 594 P.2d 340, 343 (Ct.App.1979). In this case, the State was required to show, either through direct or circumstantial evidence, that Eccleston committed "an act greatly dangerous to the lives of others indicating a depraved mind without regard for human life," *see* UJI 14–203 NMRA 1997, and also that Baca "helped, encouraged or caused" Eccleston's act, intending that the crime occur. *See* UJI 14–2822(3).

{16} In *Brown,* 1996 NMSC 073, ¶ 14, 122 N.M. at 727, 931 P.2d at 72, we indicated that one factor in identifying depraved-mind murder is "the number of persons subjected to the risk of death." We also said that "[b]ecause the legislature has deemed that a killing performed with a depraved mind is an especially serious homicide, deserving of punishment equal to that imposed for other forms of first-degree murder, we conclude that the legislature intended the offense of depraved mind murder to encompass an intensified malice or evil intent." *Id.* ¶ 15, 122

N.M. at 727, 931 P.2d at 72. There must be proof that "the defendant had 'subjective knowledge' that his or her act was extremely dangerous to the lives of others." *Id.* ¶ 16, 122 N.M. at 728, 931 P.2d at 73 (quoting *Omar–Muhammad,* 102 N.M. at 278, 694 P.2d at 926). "The required mens rea element of 'subjective knowledge' serves as proof that the defendant acted with a 'depraved mind' or 'wicked or malignant heart' and with utter disregard for human life." *Id.* (quoting *Omar–Muhammad,* 102 N.M. at 278, 694 P.2d at 926, and *Hernandez,* 1994 NMSC 043, 117 N.M. at 499, 873 P.2d at 245).

{17} Based on the evidence summarized below, we conclude that the State carried its evidentiary burden. There is sufficient evidence to support findings that (1) Eccleston committed an act greatly dangerous to the lives of others, (2) knowing that the act created a risk of death or great bodily harm, which indicated a depraved mind, regardless of the lives of others, and (3) that Baca helped him commit that act. We also conclude that the State carried its burden of showing that (4) Baca shared Eccleston's purpose or design.

### 2. The Evidence of Accessory Liability.

{18} Baca argues that the evidence, viewed in the light most favorable to the verdict, shows at most that he shared an intent to shoot at the tires and that shooting at the tires was not an act greatly dangerous to the lives of others, indicating a depraved mind heedless of the lives of others. He reasons that the evidence was insufficient as a matter of law to support his conviction for depraved-mind murder and, thus, also was insufficient to support his conviction of conspiracy to commit depraved-mind murder. We disagree with Baca's analysis of the evidence and, therefore, need not reach Baca's analysis of the law.

{19} This Court must ensure that "a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *Garcia,* 1992 NMSC 046, 114 N.M. at 274, 837 P.2d at 867. Here, the State had the burden to prove that Baca and

Eccleston intended to shoot at Comingo's car, thereby sharing the general purpose to commit an act greatly dangerous to the lives of others. Larry Betancourt testified that the car driven by Baca veered to the left as if the driver attempted to "line up" the passenger side of his car with Comingo's driver's side. Baca testified that he did not do this. Additionally, John Bacon testified that after Eccleston fired the shots, Baca laughed and said, "I thought you were shooting for the tires." The jury might have believed Baca's testimony and rejected Betancourt's testimony. A jury therefore might have found that Baca realized only after the shots were fired that Eccleston intended to shoot at the driver. However, a reasonable jury also might have rejected Baca's testimony.

{20} Baca testified that earlier in the evening he had seen Eccleston playing with his forty-five-caliber handgun, "showing it off like he always does," and saying he "loved" his gun. Baca testified further that, although he did not actually see the gun inside the pool hall, he was aware Eccleston had it with him, around his waist on an elastic strap. Similarly, he testified that he did not actually see Eccleston holding the gun as he got into Baca's car to leave the pool hall, but he was aware that Eccleston "still had it strapped around like his [waist] where he had that strap." While they were driving around after leaving the pool hall, and at the intersection, as Baca started chasing Comingo's car, Baca knew Eccleston had the gun with him. Baca testified, however, that he did not know Eccleston was going to shoot the gun.

{21} If the jury rejected Baca's testimony, the jury was entitled to infer that Baca positioned the car because he knew that Eccleston was aiming his gun at the driver. If the jury was willing to draw that inference, then the jury was entitled to find that Baca shared Eccleston's purpose in firing into the interior of the car. *See Brown*, 1996 NMSC 073, ¶ 31, 122 N.M. at 731, 931 P.2d at 76 ("[I]t is for the jury to weigh the credibility of the witnesses...."). Such a finding would justify a conclusion that Eccleston committed an act greatly dangerous to the lives of others, indicating a depraved mind regardless of

the lives of others, that Baca helped him commit that act, and that Baca shared Eccleston's purpose. In addition, the court instructed the jury that in order to convict Baca of depraved-mind murder, it would need to find that he knew that the acts were greatly dangerous to the lives of others. Eccleston was the shooter; the jury might have viewed Baca, in effect, as providing necessary "equipment."

{22} We hold that sufficient evidence exists to affirm Baca's conviction of aiding and abetting first-degree, depraved-mind murder. In view of our holding, we do not reach Baca's argument that shooting at the tires of Comingo's car was not a sufficient basis for a conviction of depraved-mind murder. We also do not reach Baca's argument that there was insufficient evidence to convict him of conspiracy to commit depraved-mind murder. We subsequently address Baca's other argument about his conviction of conspiracy. We next address his argument that he was denied effective assistance of counsel.

### B. *INEFFECTIVE ASSISTANCE OF COUNSEL.*

{23} In New Mexico, a defendant is entitled to an instruction on lesser included offenses if there is a reasonable view of the evidence that the lesser crime could have been the highest degree of crime committed. *State v. Curley*, 1997 NMCA 038, ¶ 4, 123 N.M. 295, 297, 939 P.2d 1103, 1105. Baca reasons that a reasonably competent attorney would have requested instructions on accessory liability for second-degree murder and for shooting at a motor vehicle, and that counsel's failure to request such instructions prejudiced him, because the jury might have convicted him of a lesser offense. *See Bateson v. State*, 516 So.2d 280, 282 (Fla.Dist.Ct. App.1987) (holding failure to request instructions on lesser included offense was ineffective assistance of counsel and requiring new trial); *Waddell v. State*, 918 S.W.2d 91, 94–95 (Tex.App.1996, no pet.) (same).

{24} Baca has the burden of showing ineffective assistance of counsel. *See Duncan v. Kerby*, 1993 NMSC 011, 115 N.M. 344, 348, 851 P.2d 466, 470. In order to demonstrate ineffective assistance, a defen-

dant must show that his attorney's conduct fell below that of a reasonably competent attorney and that the ineffective performance prejudiced him or her. *Id.* If a defendant does not make such a showing, the defendant has not carried his or her burden, and the presumption of effective assistance controls. *See State v. Sanchez,* 1995 NMSC 059, 120 N.M. 247, 254, 901 P.2d 178, 185.

{25} A record on appeal that provides a basis for remanding to the trial court for an evidentiary hearing on ineffective assistance of counsel is rare. Ordinarily, such claims are heard on petition for writ of habeas corpus pursuant to Rule 5–802(A) NMRA 1997, which governs procedures for the filing of such writs by persons "in custody or under restraint for a determination that such custody or restraint is, or will be, in violation of the constitution or laws of the State of New Mexico or of the United States." We review the district court's decision in ruling on such a petition pursuant to Rule 12–501(A) NMRA 1997, which governs the procedure for filing a petition for writ of certiorari "seeking review of denials of habeas corpus petitions by the district court pursuant to Rule 5–802." That procedure permits fact-finding by the district court directed at particular claims of ineffective assistance. As the Court of Appeals has noted, "a prima facie case is not made when a plausible, rational strategy or tactic can explain the conduct of defense counsel" in this case. *State v. Richardson,* 1992 NMCA 111, 114 N.M. 725, 729, 845 P.2d 819, 823 (citing *State v. Swavola,* 1992 NMCA 089, 114 N.M. 472, 475, 840 P.2d 1238, 1241). "[I]neffective assistance usually can be reached only after an adversarial proceeding exploring the reasons for the action or inaction of defense counsel." *Richardson,* 1992 NMCA 111, 114 N.M. at 730, 845 P.2d at 824. The procedure contained in Rule 5–802 provides an appropriate forum for exploring the reasons for defense counsel action or inaction.

{26} For example, in *Woratzeck v. Ricketts,* 820 F.2d 1450, 1455 (9th Cir.1987) *judgment vacated on other grounds,* 486 U.S. 1051, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988), trial counsel had testified "that as a tactical matter, arguing a lesser included offense concerning theft might have diluted the alibi defense and resulted in a loss of credibility ." A state court had found that "not requesting the instruction was trial strategy." The federal appellate court was persuaded that counsel's decision "[fell] within the wide range of reasonable professional representation" and therefore did not support a claim that the defendant was denied effective assistance of counsel. *Id.*

{27} Similarly, the State argues that "a plausible, rational strategy or tactic can explain the conduct of defense counsel" in this case. The State reasons that defense counsel might have concluded that Baca was more likely to be acquitted on the charge of aiding and abetting depraved-mind murder than to be convicted of that crime, if no lesser included instructions were given. *See generally* Michael T. Judge, Comment, *Control and Direction of the Defense: The All–Or–Nothing Defense Tactic in the Context of Ineffective Representation,* 10 Geo. Mason L.Rev. 209 (1987) (discussing cases raising issue of ineffective assistance). We agree that the decision to pursue an alibi or all-or-nothing defense is not outside the range of effective representation. "Defense counsel's use of the all-or-nothing tactic is permissible if it is a reasoned and knowledgeable decision...." *Id.* at 226. Baca claims the record does not permit a conclusion that his counsel made a considered decision that his best defense was to agree that only instructions on first-degree murder would be given. He concludes that, on this record, we ought not conclude that counsel made a "reasoned and knowledgeable decision."

{28} During the trial court's discussion of proposed jury instructions, the trial court asked defense counsel if he wanted the court to give the jury instructions on lesser included offenses. The prosecutor expressed his opinion that Baca had "no legal right to any necessarily included offenses." Defense counsel stated, "I've researched this issue, and in my opinion there are no step downs, Your Honor. It's all or nothing in this case." Counsel might have meant that he had researched the issue of whether lesser-included-offense instructions were appropriate and, based on his research, concluded that such

instructions were not available. He might have meant he had elected to pursue an all-or-nothing defense. We cannot be certain what he meant, although in context his statement appears to express agreement with the prosecutor.

{29} In *Waddell v. State*, defense counsel failed to request a lesser included instruction on criminal trespass because he mistakenly believed that illegal entry and failure to depart were required elements. *Waddell*, 918 S.W.2d at 94. Additionally, he was not aware of relevant Texas case law. *Id.* The Texas Court of Appeals held that these errors fell below an objective standard of reasonableness and that Waddell might not have been convicted of burglary had an instruction on the lesser offense been given, and granted Waddell a new trial. *Id.* at 94–95; *cf. Bateson*, 516 So.2d at 282 (reversing a trial court's denial of a motion for post-conviction relief on the basis that the evidence appeared to support a lesser included instruction on one count, that counsel had not requested such an instruction, and it was "conceivable" that defense counsel thus deprived defendant of an opportunity for conviction of a lesser degree of the offense charged).

{30} We do not order a new trial in this case nor remand for an evidentiary hearing. Baca's counsel might have reasonably concluded that a lesser-included-offense instruction would have weakened Baca's theory at trial or strengthened that of the prosecution. Baca's counsel also might have reasonably concluded the evidence would not support an instruction on a lesser included offense, because there was no reasonable view of the evidence to support a determination of less than first-degree murder. Since counsel's statement to the trial court is consistent with either of these alternatives, we conclude that Baca has not made a prima facie showing that a reasonably competent attorney would have requested lesser included instructions.

{31} Baca's theory at trial was that he was entitled to an acquittal, because he did not share Eccleston's purpose or design. Baca testified, in effect, that he was not actually aware of any risk to Comingo and Betancourt; he was seeking information and did not know Eccleston had a different purpose. He testified, in effect, he did not know until Eccleston started shooting what Eccleston intended to do. Baca's counsel might have reasoned that requesting a lesser included instruction on second-degree murder or on shooting at a motor vehicle would have led the prosecutor and the jury to focus on Bacon's testimony. Bacon's testimony indicated that Baca knew Eccleston intended to shoot at the tires. If the jury believed that evidence, it might have believed that Baca did not know Eccleston intended to shoot at the driver, but the jury then would have had less reason to believe Baca's testimony.

{32} Further, the statement by Bacon, if believed by the jury, would have supported a jury determination that Baca shared Eccleston's purpose in shooting at the tires. If Baca shared that purpose, then he aided and abetted an act that Baca's attorney might have believed, with reason, was sufficient to support a determination of either depraved-mind murder or second-degree murder, based on reckless conduct. *See Brown*, 1996 NMSC 073, ¶ 14, 122 N.M. at 727, 931 P.2d at 72 (noting that "[b]ecause depraved mind murder involves a higher degree of recklessness, one previously-recognized distinction between the two degrees of homicide is the number of persons subjected to the risk of death," but also stating that the number of persons subjected to the risk of death is not determinative of the degree of murder). Baca's counsel might have preferred not to provide the jury a second basis for finding depraved-mind murder.

{33} Finally, Baca's counsel might have reasoned that the evidence did not support a finding that either shooting at a motor vehicle or second-degree murder was the highest degree of offense committed. *Cf. State v. Magdaleno Baca*, 1997 NMSC 018, ¶ 14, 123 N.M. 124, 127, 934 P.2d 1053, 1056 (stating that failure to propose an instruction which lacks an evidentiary basis is not ineffective assistance). Unless there is a reasonable view of the evidence that a lesser crime could have been the highest degree of crime committed, a defendant is not entitled to an instruction on that lesser included offense. *Curley*, 1997 NMCA 038, ¶ 5, 123 N.M. 295, 297, 939 P.2d 1103, 1105.

{34} In defining the crime of shooting at a motor vehicle, the legislature did not provide a specific penalty for a shooting that results in death. *See generally* Section 30–3–8(B) (defining the degree of offense based on the result of the shooting and affixing the highest degree of the crime for a shooting resulting in great bodily injury). Because Baca did not dispute that the shooting resulted in Comingo's death, Baca's counsel reasonably could conclude that this crime was not available as a lesser included offense. Baca's counsel might have reasoned that the evidence would not support a determination that shooting at a motor vehicle was the highest degree of crime committed.

{35} Baca's counsel might have made a comparable analysis of Baca's right to a lesser included instruction on second-degree murder. We have said that the crime of depraved-mind murder and the crime of second-degree murder differ from each other in the degree of recklessness and the type of knowledge the jury must find beyond a reasonable doubt. *See Brown*, 1996 NMSC 073, ¶¶ 14–16, 122 N.M. at 727–28, 931 P.2d at 72–73. A conviction of depraved-mind murder requires a finding that the defendant actually knew his conduct was extremely dangerous to the lives of others, while a conviction for second-degree murder requires a finding that the defendant knew or should have known his acts created a strong probability of death or great bodily harm. *See* § 30–2–1(B); *Brown*, 1996 NMSC 073, ¶ 16, 122 N.M. at 727–28, 931 P.2d at 72–73. Thus, there is a difference in mens rea between depraved-mind murder and second-degree murder. However, we also have said that our felony murder rule "serves to raise second-degree murder to first-degree murder when the murder is committed in the course of a dangerous felony." *State v. Campos*, 1996 NMSC 043, ¶ 17, 122 N.M. 148, 154, 921 P.2d 1266, 1272; *see also State v. Lopez*, 1996 NMSC 036, 122 N.M. 63, 66, 920 P.2d 1017, 1020 ("[B]ecause of this mens-rea requirement, our felony-murder rule is best described as elevating the crime of second-degree murder to first-degree murder when the murder is committed during the course of a dangerous felony.").

{36} An act of shooting at or from a vehicle, which results in great bodily harm, is a second-degree felony. *See* § 30–3–8(B). The crime of shooting at or from a motor vehicle is defined as "willfully discharging a firearm at or from a motor vehicle with reckless disregard for the person of another." *Id.* Baca's counsel reasonably might have concluded that shooting at a vehicle was a dangerous felony, that Comingo was murdered in the course of shooting at a vehicle, and thus the evidence could not be said to support a conclusion that either shooting at a motor vehicle or second-degree murder was the highest degree of offense committed. Rather, he reasonably might have concluded the evidence presented to the jury would have supported conviction of all three varieties of first-degree murder: premeditated murder, felony murder, and depraved-mind murder. *See* § 30–2–1(A). We need not decide whether he was right. We must only decide whether a reasonably competent attorney might have reasoned and concluded as he did.

{37} The law of murder has been the subject of several significant opinions by this Court since Baca's trial. *Compare Brown* 1996 NMSC 073, ¶¶ 13–35, 122 N.M. at 726–32, 931 P.2d at 71–77 (discussing elements of depraved-mind murder), *with Campos*, 1996 NMSC 043, ¶¶ 17–19, 122 N.M. at 154, 921 P.2d 1272–78 (comparing the felony murder doctrine and second-degree murder), *and Lopez*, 1996 NMSC 036, ¶ 18, 122 N.M. at 67–68, 920 P.2d at 1021–22 (same). However, *Brown, Campos,* and *Lopez* relied on *State v. Ortega*, 112 N.M. 554, 817 P.2d 1196 (1991). In *Ortega*, we said that "an intent to kill in the form of knowledge that the defendant's acts 'create a strong probability of death or great bodily harm' to the victim or another, so that the killing would be only second degree murder under Section 30–2–1(B) if no felony were involved, is sufficient to constitute murder in the first degree when a felony *is* involved—or so the legislature has determined." *Id.* at 563, 817 P.2d at 1205 (quoting § 30–2–1(B)) (emphasis added). Based on this passage, Baca's counsel reasonably might have rejected the possibility that either second-degree murder or shooting at a motor vehicle was the highest degree of of-

fense charged. Rather, he reasonably might have concluded that the evidence would support, as the highest degree of offense charged, not only premeditated murder and depraved-mind murder, but also felony murder. *See generally* UJI 14–2821 NMRA 1997 ("Aiding or abetting accessory to felony murder.").

{38} For these reasons, we conclude the record on direct appeal supports a conclusion that defense counsel pursued a "plausible, rational strategy." *Richardson,* 1992 NMCA 111, 114 N.M. at 729, 845 P.2d at 823. Baca has not made a prima facie showing of ineffective assistance. We do not, however, intend to preclude Baca's right to pursue post-conviction relief pursuant to Rule 5–802.

### III.

{39} Baca argues that the trial judge's actions in considering two separate communications from jurors violated his right to be present at every stage of his trial. Rule 5–612(A) NMRA 1997 states that "defendant shall be present . . . at every stage of the trial." A judge violates a defendant's right to be present at every stage of his trial *only* if the judge's discussion with a juror concerns the subject matter of the case. *See State v. Neely,* 112 N.M. 702, 711, 819 P.2d 249, 258 (1991); *State v. Wilson,* 109 N.M. 541, 546, 787 P.2d 821, 826 (1990) *Hovey v. State,* 104 N.M. 667, 670, 726 P.2d 344, 347 (1986). If the matter discussed does involve an issue in the case, a presumption of prejudice arises which the State must rebut "by making an affirmative showing on the record that the communication did not affect the jury's verdict." *Hovey,* 104 N.M. at 670, 726 P.2d at 347. No presumption arises in this case.

{40} The first note informed the court that a juror did not feel comfortable when the defense approached the witness. This note did not concern an issue at the trial. Further, the court did not respond to the juror's concerns. The second note came from a juror asking to speak with the trial judge on a personal matter. The judge met with the juror who asked to speak with him. Prior to talking with her, the judge asked defense counsel and the prosecutor whether they had any objection to him meeting with the juror. Neither party raised any objections. The judge met with the juror, who notified him that she knew a spectator who had been signalling to a witness and whom the judge ejected from the courtroom for this behavior. She told the judge that the spectator knew where she lived and that she was nervous. Following the meeting, the judge called defense counsel, Baca, and the prosecutor into chambers to discuss the juror's concern. The judge informed counsel that he intended to excuse her from serving on the jury. Defense counsel objected to her dismissal, which the judge noted. The judge and the juror did not discuss any issue at trial during their conversation. Baca was present when the judge asked if anyone objected to his meeting with the juror. He was also present at the hearing in chambers.

{41} We are not required "to find reversible error in every communication between the court and a juror when the communication is not relevant to [the] substance of the case." *Neely,* 112 N.M. at 712, 819 P.2d at 259. As the Court in *Neely* noted, it is good practice "to inform defense counsel and defendant as soon as practicable of the substance of the communication." *Id.* Here, the communications were not relevant to the substance of the case. The trial court followed the practice recommended in *Neely. See id .* On these facts, we conclude no improper communication occurred.

### IV.

{42} Baca has argued that he is entitled to a new trial on the charge of conspiracy because the jury instruction was incorrect. We agree with Baca that the instruction given was error.

{43} In this case, the jury's instruction on conspiracy to commit depraved-mind murder was as follows:

### INSTRUCTION NO. 9

For you to find the defendant guilty of conspiracy to commit first degree murder by an act greatly dangerous to the lives of others as charged in the Alternative to

Count 2, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. The defendant by words or acts helped, encouraged or caused another person to shoot at an occupied vehicle and such act was greatly dangerous to the life of another;

2. The defendant and the other person intended that the occupied vehicle be shot at:

3. This happened in New Mexico on or about the 13th day of December, 1994.

This instruction generally tracks the uniform jury instruction on aiding and abetting. *See* UJI 14–2822.

{44} The conspiracy instruction, as given in this case, omits the element of agreement contained in the uniform jury instruction defining the essential elements of conspiracy. That instruction provides as follows:

For you to find the defendant guilty of conspiracy to commit _____ [as charged in Count __], the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. The defendant and another person by words or acts agreed together to commit _____:

2. The defendant and the other person intended to commit _____;

3. This happened in New Mexico on or about the ___ day of _____, 19__.

UJI 14–2810 NMRA 1987 (conspiracy; essential elements) (notations and use notes omitted).

## A. *ADEQUACY OF THE INSTRUCTION GIVEN.*

{45} The State agrees that the instruction omits an essential element but argues that taken as a whole, the instructions adequately covered the element of agreement. The State relies on the fact that, in order to convict Baca as an accomplice, the jury must have found an implied mutual understanding that Baca positioned his car so that Eccleston could shoot into Comingo's car. We are not persuaded.

{46} Accomplice liability and conspiracy "are distinct and separate concepts." *State v. Armijo*, 90 N.M. 12, 15, 558 P.2d 1151, 1154 (Ct.App.1976) (citation omitted). Our conspiracy statute requires that the defendant *"knowingly* combin[e] with another for the *purpose* of committing a felony." Section 30–28–2(A) (emphasis added). "An agreement is the gist of the crime...." *State v. Padilla*, 1994 NMCA 070, 118 N.M. 189, 193, 879 P.2d 1208, 1212. "[T]he crime is complete when the felonious agreement is reached." *Id.* (quoting *State v. Leyba*, 93 N.M. 366, 367, 600 P.2d 312, 313 (Ct.App. 1979)). In addition, "it is useful to note that there are really two intents required for the crime of conspiracy." 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 6.4(e)(1), at 76 (1986) [hereinafter *Substantive Criminal Law* ]. First, the parties must intend to agree. *Id.* Second, the parties must intend "to achieve a particular result which is criminal or which though noncriminal is nevertheless covered by the law of conspiracy." *Id.* § 6.4(e)(2), at 77 (footnotes omitted). "[T]he fact that conspiracy requires an intent to achieve a certain objective means that individuals who have together committed a certain crime have not necessarily participated in a conspiracy to commit that crime." *Id.* at 78. The accessory statute does not contain language requiring an intentional act: "A person may be charged with and convicted of the crime as an accessory if he procures, counsels, aids or abets in its commission and although he did not directly commit the crime...." Section 30–1–13; *cf.* Model Penal Code § 2.06, at 295, (Official Draft and Revised Comments 1962) (defining liability for the conduct of another, or "complicity").

{47} The Model Penal Code specifically distinguishes the culpability associated with accomplice liability from that appropriate to liability for conspiracy. "When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense." Model Penal Code § 2.06(4), at 296.

However, the Model Penal Code has taken the position that "when recklessness or negligence suffices for the actor's culpability with respect to a result element of a substantive crime, as for example when homicide through negligence is made criminal, there could not be a conspiracy to commit that crime." Model Penal Code § 5.03 cmt. 2(c)(i), at 408.

{48} Other scholars have agreed that it is important to make a clear distinction between liability as an accomplice and liability as a conspirator.

> One source of continuing confusion in this area is whether the doctrines concerning complicity and conspiracy are essentially the same, so that liability as a conspirator and as an accomplice may be based upon essentially the same facts. Is one who is a member of a conspiracy of necessity a party to any crime committed in the course of the conspiracy? Is one who qualifies as an accomplice to a crime of necessity part of a conspiracy to commit that crime? Under the better view, both of these questions must be answered in the negative.

See generally *Substantive Criminal Law, supra,* § 6.8(a), at 153 (distinguishing conspiracy and complicity).

{49} The Model Penal Code discusses liability of accomplices, generally, and of conspirators, specifically, and provides a policy basis for the necessary distinctions:

> The most important point at which the Model Code formulation diverges from the language of many courts is that it does not make "conspiracy" as such a basis of complicity in substantive offenses committed in furtherance of its aims. It asks, instead, more specific questions about the behavior charged to constitute complicity, such as whether the defendant solicited commission of the particular offense or whether he aided, or agreed or attempted to aid, in its commission.
>
> The reason for this treatment is that there appears to be no better way to confine within reasonable limits the scope of

liability to which conspiracy may theoretically give rise.

Model Penal Code, § 2.06(4) cmt. 6(a), at 307.

{50} Based on these authorities and under Section 30–28–2, we conclude that the instruction given on the charge of conspiracy should have, but did not, distinguish that crime from criminal liability as an accessory. The jury was not asked to make the necessary distinctions. Ordinarily, the error Baca has identified would entitle him to a new trial on the conviction for conspiracy to commit depraved-mind murder. However, Baca also argued that conspiracy to commit depraved-mind murder is not a valid charge. For the following reasons, we are persuaded that he is correct.

## B. *CONSPIRACY TO COMMIT DEPRAVED–MIND MURDER.*

{51} In *Johnson,* our Court of Appeals held that the crime of attempted depraved-mind murder did not exist because attempt is a specific-intent crime. *Johnson,* 103 N.M. at 369, 707 P.2d at 1179. "In New Mexico, specific intent is the intent to do a further act or achieve a further consequence." *Id.* "The specific intent for attempt is the intent to commit the crime attempted." *Id.* Because depraved-mind murder is an unintentional killing resulting from highly reckless behavior, attempted depraved-mind murder "is logically impossible." *Id.* at 368, 707 P.2d at 1178 (quoting *Commonwealth v. Griffin,* 310 Pa.Super. 39, 456 A.2d 171, 177 (Pa.Super.Ct .1983)). Baca notes that conspiracy, like attempt, is a specific-intent crime. We agree.[1] "Conspiracy and attempt are, as the [United States] Supreme Court has said, paradigmatic specific intent offenses." Michael E. Tigar, *"Willfulness" and "Ignorance" in Federal Criminal Law,* 37 Clev.St.L.Rev. 525, 531 (1989) (citing *United States v. Bailey,* 444 U.S. 394, 405, 100 S.Ct. 624, 632, 62 L.Ed.2d 575 (1980)). Baca argues that conspiracy to commit depraved-mind murder is similarly "impossi-

---

1. By contrast, liability for complicity does not require a specific intent to commit the crime. It is sufficient that a defendant intends to aid or abet and possesses "the kind of culpability, if any, with respect to [a] result that is sufficient for the commission of the offense." Model Penal Code § 2 .06(4), at 296. Aiding and abetting liability is not incompatible with depraved-mind murder.

ble." We are not convinced that the crime of conspiracy to commit depraved-mind murder is "logically impossible." Nevertheless, we are convinced that, as presently written, Section 30–28–2 does not encompass the crime of depraved-mind murder. Conspiracy in New Mexico requires both an intent to agree and an intent to commit the offense which is the object of the conspiracy. As depraved-mind murder is presently defined by statute and case law, the charge of conspiracy to commit depraved-mind murder was not valid.

{52} The California Supreme Court recently reached a similar result in connection with conspiracy to commit that form of second-degree murder under California law known as "implied malice murder." *See People v. Swain*, 12 Cal.4th 593, 49 Cal.Rptr.2d 390, 394–97, 909 P.2d 994, 998–1001 (1996) (describing "implied malice murder" under California law). For "implied malice murder," under California law, the required mens rea is "implied from the specific intent to do some act *other than* an intentional killing *and* the resulting circumstance: a killing that has in fact occurred as 'the direct result of such an act.'" *Id.* 49 Cal.Rptr.2d at 395, 909 P.2d at 999 (quoting California Jury Instruction No. 8.31). The California Supreme Court reasoned the "nature" of implied malice murder is inconsistent with the "nature of the crime of conspiracy." *Id.* In conspiracy, culpability is fixed at an earlier point in time than even the crime of attempt. *Id.* (quoting Model Penal Code § 5.03 cmt. 1, at 387–88). Because implied malice murder requires a particular result and depends on that result to support an inference of intent, the two crimes have been considered incompatible. Conspiracy cannot be based on this theory because a defendant cannot agree to kill and simultaneously disregard the risk of death. In *State v. Beccia*, 199 Conn. 1, 505 A.2d 683, 684–85 (1986), the Connecticut Supreme Court similarly described the crime of conspiracy to commit arson in the third degree as not "cognizable" under Connecticut law. *Id.* 505 A.2d at 685. The Court explained that "conspirators can agree to start a fire intentionally or to cause an explosion or even agree to act recklessly, [but] they cannot agree to accomplish a required specific result unintentionally." *Id.* at 684.

{53} We construe Section 30–28–2 to limit conspiracy as provided in the Model Penal Code and applied in California and Connecticut. Therefore, we hold that Section 30–28–2 does not encompass conspiracy to commit depraved-mind murder. Baca might have been charged with conspiracy to shoot at or from a vehicle. *Cf. Beccia*, 505 A.2d at 684; Model Penal Code § 5.03 cmt. 2(c)(i), at 408 (distinguishing "a crime defined in terms of conduct that creates a risk of harm, such·as reckless driving or driving above certain speed limit," from crime defined in terms of a result). Under New Mexico law as it presently stands, he could not be charged with conspiracy to commit depraved-mind murder. For these reasons, we reverse Baca's conviction for conspiracy to commit first-degree, depraved-mind murder.

## V.

{54} Baca's final argument rests on two comments the prosecutor made, one during voir dire and the other during closing arguments. During voir dire, the prosecutor noted that the State was not seeking the death penalty in this case. Under Rule 14–6007, the jury may not consider the possible penalties in the case, *with one exception.* As the Use Note to Rule 14–6007 states, "In a capital case it is proper for the state or court in the voir dire ... to tell the jury that the state will not seek the death penalty." Rule 14–6007, Use Note, NMRA 1997. The prosecutor did not err in making this statement.

{55} The State concedes impropriety in the prosecutor's comparison, during closing argument, of Ricky Comingo's mother holding her son, with "the Pieta, the Madonna holding Jesus off the cross." The prosecutor prefaced his comparison with the statement, "You want to talk about things that indicate that mind, a depraved mind without regard for human life. They go to Village Inn to eat while Ricky Comingo's mother is holding that towel trying to keep his life blood from flowing out." The State concedes, and we agree, that the comment was an improper appeal to the jury's sympathy for the victim and his family. *See State*

*v. Fero,* 105 N.M. 339, 345, 732 P.2d 866, 872 (1987); *cf. State v. Abeyta,* 1995 NMSC 052, 120 N.M. 233, 247, 901 P.2d 164, 178 (1995) (abrogated on other grounds by *Campos,* 1996 NMSC 043, n. 4, 122 N.M. at 158 n. 4, 921 P.2d at 1276 n. 4). However, Baca's counsel failed to object to this statement. Therefore, we review this issue to determine whether fundamental error occurred. *State v. Apodaca,* 1994 NMSC 121, 118 N.M. 762, 769, 887 P.2d 756, 763. Under the doctrine of fundamental error, we reverse only if substantial justice has not been done or the "question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand." *State v. Osborne,* 111 N.M. 654, 662, 808 P.2d 624, 632 (1991) (quoting *State v. Rogers,* 80 N.M. 230, 232, 453 P.2d 593, 595 (1969)). Neither ground for fundamental error is appropriate in this case.

## VI. CONCLUSION

{56} For the foregoing reasons, we affirm Baca's conviction for aiding and abetting first-degree, depraved-mind murder. We reverse his conviction for conspiracy and remand with instructions that the district court vacate this conviction and enter an amended judgment and sentence consistent with this opinion.

{57} **IT IS SO ORDERED.**

FRANCHINI, C.J., and BACA and SERNA, JJ., concur.

