This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date:  July 19, 2018**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                              NO.  S-1-SC-35942

**ALBERT TEGEDA, III,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CHAVES COUNTY**
**Steven L. Bell, District Judge**

Robert Tangora, L.L.C.
Robert Tangora
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
John Kloss, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**MAES, Justice**

{1}     Following a three-day jury trial, Defendant Albert Tegeda was found guilty of first-degree murder for willfully and deliberately killing Celso Martinez contrary to NMSA 1978, Section 30-2-1(A)(1) (1994).  The jury acquitted Defendant of the charge of conspiracy to commit murder.  *See* NMSA 1978, § 30-28-2 (1979).  The district court sentenced Defendant to life imprisonment.

{2}     On direct appeal pursuant to Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA, Defendant raises four issues: (1) the district court erred by denying his motion to suppress statements he made to law enforcement; (2) his trial counsel was ineffective for not challenging the testimony of Dr. Michelle Barry, forensic pathologist; (3) the evidence was insufficient to support his conviction for first-degree murder; and (4) the district court's errors taken together constitute cumulative error.

{3}     We affirm Defendant's conviction.  Because Defendant raises no questions of law that New Mexico precedent does not already sufficiently address, we issue this non-precedential decision.  *See* Rule 12-405(B)(1) NMRA.

**I.     BACKGROUND**

{4}     The following facts are from the trial testimony of Defendant, Edna Hernandez,

2

Thomas Archuleta, Richardo Ortega, and Ramon Loya Jr. All were chronic methamphetamine users and were together at different times on the morning of the shooting. Defendant, Hernandez, and Archuleta testified that by the morning of the shooting, they had been up for over five days consuming the drug. Hernandez said she had known Defendant for about a year and ran into him from time to time, but they were not friends. Defendant said he met Hernandez in the "drug circle," they "got along pretty good," and "we were just always getting high." Hernandez and Archuleta were friends with the victim, Celso Martinez.

{5}     Approximately two to three weeks before Martinez was killed, Archuleta and Martinez held two garage sales at Archuleta's house. Martinez became angry with Archuleta because he believed Archuleta was taking more than his share of the profits. The dispute escalated, and on two occasions Martinez violently confronted Archuleta at his house while Archuleta's wife and kids were present. Martinez struck Archuleta on the head with the butt of his handgun and fired a shot at Archuleta but missed. The police were called, and Martinez hid two guns on Archuleta's property. Hernandez testified that Archuleta was afraid of Martinez.

{6}     In the early morning of November 30, 2007, Archuleta and Hernandez ran into Martinez outside a friend's house. The three went to the home of Ramon Loya Jr.

3

After they arrived at Loya's house, they decided to steal gasoline from trucks parked at Goddard High School. They drove to Goddard High, and Hernandez and Loya waited in the car while Archuleta and Martinez siphoned gas from the trucks.

{7} After stealing the gasoline, Hernandez and Archuleta then left Loya's house and went to Richardo Ortega's house. Loya and Martinez stayed behind. Hernandez said Defendant was at Ortega's house when they arrived. At Ortega's house Defendant, Hernandez, and Archuleta hung out and smoked methamphetamine. Hernandez said she brought a gun to Ortega's house. She said she showed the gun to everyone and everyone picked it up, but she did not know who ended up with it. Archuleta testified that he retrieved the gun from his house before going to Ortega's and left it "in the middle of the seat" of his car.

{8} At some point, Ortega's roommate asked Hernandez if she would go to Loya's house and trade methamphetamine for some of the stolen gasoline. As Hernandez was leaving, Defendant asked her if he could go along so he could pick up his girlfriend. When Defendant and Hernandez arrived at Loya's, Martinez got in the back seat of the car, saying he wanted a ride to a friend's house. Loya also asked Hernandez for a ride. According to Loya, Hernandez said it would not be a good idea to go with her because they were "about to go merk some fool." Loya said that "merk" is street

slang for "kill somebody." Hernandez denied saying this to Loya, said she did not know what "merk" meant, and had never used the word. Defendant said he did not want to give Loya a ride because his girlfriend was waiting for him. Hernandez, Defendant, and Martinez left Loya's house and Loya stayed behind.

{9}    After the three left Loya's place, Martinez began to argue with Hernandez and became angry. Defendant testified he became concerned that Martinez might assault Hernandez. Defendant said a gun was fired inside the car, and he told Hernandez to pull over. Hernandez did not testify that a shot was fired inside the car. After Hernandez pulled over, Defendant and Martinez got out of the car. Defendant testified that Martinez pointed the gun at Defendant and Defendant grabbed it. The two men struggled for control of the gun and it fired, hitting Martinez. Defendant got back in the car, and he and Hernandez returned to Ortega's house.

{10}    Hernandez testified there was no plan to kill Martinez. She said that the two men said nothing to each other before they got out of the car and she did not see what happened afterward because she stayed in the car. Hernandez said she did not hear any gunshots because the music on the radio was very loud. She said she did not know that Martinez had been shot or why he didn't get back in the car.

{11}    Deputy Raul Valderaz and Deputy George Wallner both testified about the law

enforcement investigation into Martinez's death. After the shooting, the deputies initially turned their attention to Archuleta due to the dispute between Archuleta and Martinez. When deputies located Archuleta later that same morning of the shooting, he was with Defendant and Hernandez. Deputies briefly questioned Defendant, and he denied knowing anything about the shooting. Deputies found methamphetamine on Defendant, and six days later on December 6, 2007, Defendant was arrested for a probation violation and brought to the Chaves County Sheriff's office and questioned about the Martinez shooting.

{12} The deputies advised the Defendant of his rights, and he again told them that he knew nothing about the shooting. Defendant then said he did not want to talk anymore, and the interview was terminated. Deputy Valderaz took Defendant to a holding cell where he was to wait to be transported to the county detention center to be held on the probation violation.

{13} As Defendant waited, Deputy Valderaz checked on Defendant and asked him on two or three occasions if he was okay. The last time Valderaz checked on Defendant, Defendant asked Valderaz about the possible charges he was facing. Valderaz told Defendant he was facing an open charge of murder. Defendant then asked Valderaz about possible charges against other people involved in the case.

Valderaz said that at that point Defendant became emotional and started to cry. Valderaz said it seemed like Defendant wanted to speak to the deputies again, and he asked Defendant if he wanted to do so. Defendant said he would speak to the deputies again, and Valderaz took Defendant back to the interview room. After he was reminded of his rights, Defendant told the deputies that he shot Martinez. Defendant's second statement was made about thirty minutes after his first statement.

**{14}** The State charged Defendant with murder and conspiracy to commit murder. Defendant was found guilty of first-degree murder but acquitted of the charge of conspiracy to commit murder.

## II.    DISCUSSION

### A.    The District Court Did Not Err in Admitting Defendant's Statements to Law Enforcement Officers

**{15}** Defendant filed a pre-trial motion to suppress his statements to the deputies. After a hearing, the district court issued twenty-one findings of fact and denied the motion in a written order filed on the first day of the jury trial. On appeal, Defendant argues that the district court erred in denying his motion to suppress the statements he made to Deputy Valderaz and Deputy Wallner on December 6, 2007. Specifically, Defendant contends that his first statement was involuntary and his waiver of his *Miranda* rights was not knowing, intelligent, and voluntary. Concerning his second

statement, Defendant concedes that he agreed to speak to the deputies but argues that he did so because he was coerced. However, Defendant offers no details and makes no argument as to how he was coerced or why his agreeing to speak to the deputies the second time was the product of police overreach.

{16} On appeal, the district court's admission of incriminating statements made by the defendant is reviewed de novo. *State v. Cooper*, 1997-NMSC-058, ¶ 25, 124 N.M. 277, 949 P.2d 660; *State v. Juarez*, 1995-NMCA-085, ¶ 7, 120 N.M. 499, 903 P.2d 241 (applying de novo review to voluntariness of confession). We review the entire record and the circumstances under which the statement or confession was made in order to make an independent determination of whether a defendant's confession was voluntary. *State v. Fekete*, 1995-NMSC-049, ¶ 34, 120 N.M. 290, 901 P.2d 708 (citations omitted). To satisfy due process standards, "a confession must have been freely given and not induced by promise or threat." *Aguilar v. State*, 1988-NMSC-004, ¶ 11, 106 N.M. 798, 751 P.2d 178. A confession is involuntary only if official coercion has occurred. *State v. Munoz*, 1998-NMSC-048, ¶ 21, 126 N.M. 535, 972 P.2d 847. Official coercion occurs when "a defendant's will has been overborne and his capacity for self-determination [has been] critically impaired." *Id.* ¶ 20 (citation omitted). "The prosecution has the burden of proving the voluntariness of a

8

defendant's statement by a preponderance of the evidence." *Fekete*, 1995-NMSC-049, ¶ 34.

**1.     Defendant's First Statement**

{17}     Defendant testified that, when he gave his first statement, he was advised of his *Miranda* rights and signed a waiver of those rights.  But Defendant did not say that the deputies coerced or threatened him to sign the waiver form or to speak to them on the first occasion.  A review of the testimony at the suppression hearing supports the district court's conclusion that Defendant knowingly, intelligently, and voluntarily waived his right to remain silent.  Accordingly, Defendant's first statement to the deputies was voluntary and not the product of official coercion and we affirm the district court.

**2.     Defendant's Second Statement**

{18}     Approximately thirty minutes elapsed between Defendant's first and second statement.  Defendant testified that he returned to the interrogation room because Valderaz badgered him to "get it off [his] chest" and "come clean."  At the conclusion of the first interview, a deputy told Defendant that they would be looking at possible charges against the Defendant's grandmother.  As he was escorted to the booking cell, Deputy Wallner told Defendant his grandmother would be arrested if they found out

the Defendant was not at her house at the time of the murder. While Defendant waited in the booking cell, Valderaz checked on Defendant on two or three occasions and asked Defendant if he was okay. On the last occasion, Defendant asked Valderaz about the possible charges he was facing. Valderaz told Defendant he was facing an open count of murder. Defendant then asked Valderaz about possible charges for others involved and Valderaz told Defendant that they could also be charged with murder. Valderaz said that at that point, Defendant appeared as if he were about to cry and that he wanted to talk. Valderaz escorted Defendant back to the interrogation room. Defendant was reminded of the *Miranda* warnings previously given but was not given the full *Miranda* warning. Defendant was asked if he wished to speak to the deputies again and he replied that he did. Defendant was asked if he had been forced or coerced in any way to provide a further statement, and Defendant said he had not. Defendant was crying when he returned to the interrogation room but stopped crying and then proceeded to give his statement about the events leading up to and including the shooting of Martinez.

{19} Upon review of the testimony of the events between the interviews, we conclude that the district court did not err in finding the Defendant voluntarily spoke to the deputies in the second interview. The Defendant told the deputies he would

10

speak with them and testified that he was not forced or coerced to do so. Neither the threats to arrest or bring charges against Defendant's grandmother or Valderaz telling Defendant to "come clean" and "get it off his chest" appear to have been so coercive as to overcome Defendant's will such that his statement was not the product of his own volition. The Defendant had been advised of his *Miranda* rights before the first interview, and the second interview was not so long after the first such that the deputies were required to fully advise Defendant of his *Miranda* rights again. *See State v. Gilbert*, 1982-NMSC-095, ¶ 12, 98 N.M. 530, 650 P.2d 814 (holding that a second *Miranda* warning was not required when the defendant was previously informed of his *Miranda* rights earlier the same day and the defendant was still aware of his rights). Accordingly, we affirm the district court's denial of Defendant's motion to suppress his second statement to the deputies.

**B.      Defense Counsel Was Not Ineffective for Failing to Object to the Testimony of Dr. Michelle Barry**

{20}    Defendant argues that his attorney was ineffective because he should have objected to the testimony of Dr. Michelle Barry regarding the findings and conclusions of the autopsy performed on Martinez. Defendant claims that because Dr. Barry did not perform the autopsy of Martinez, his right to confront the witnesses against him was violated. *See* U.S. Const. amend. VI. Defendant further argues that

11

he was prejudiced because the trajectory of the bullet wounds were critical to his claim of self-defense.

{21} To prevail on a claim of ineffective assistance of counsel, a defendant must show: "(1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense." *State v. Favela*, 2015-NMSC-005, ¶ 10, 343 P.3d 178 (internal quotation marks and citation omitted); *State v. Lopez*, 1996-NMSC-036, ¶ 25, 122 N.M. 63, 920 P.2d 1017. Defendant has the burden to show both incompetence and prejudice. *State v. Baca*, 1997-NMSC-059, ¶ 24, 124 N.M. 333, 950 P.2d 776.

{22} Defendant cites *State v. Navarette*, 2013-NMSC-003, 294 P.3d 435, in support of his confrontation claim. In *Navarette*, this Court held that the defendant's confrontation rights were violated because a forensic pathologist who did not participate in or observe the autopsy on the victim was allowed to relate testimonial hearsay about the findings and conclusions of the autopsy. *Id.* ¶ 23. In the present case, Dr. Barry testified that she did not conduct the autopsy but she supervised the autopsy, examined the body both externally and internally, examined photos and looked at slides of the body under the microscope, and personally signed the autopsy report along with the presiding pathologist. The facts of this case are similar to the

12

facts in *State v. Cabezuela*, 2011-NMSC-041, ¶¶ 49-52, 150 N.M. 654, 265 P.3d 705. In *Cabezuela*, this Court ruled a supervising pathologist (in that case, also Dr. Barry) who had examined the body, examined photographs, conducted a microscopic examination, and co-signed autopsy reports had sufficient personal knowledge to testify as to what the attending pathologist discovered through the autopsy. *Id.* ¶ 52. Like *Cabezuela*, we conclude that in this case Dr. Barry had sufficient personal knowledge of the conclusions of the autopsy, her testimony was based on her own observations, and she was not merely relating hearsay testimonial evidence. Defendant had the opportunity to confront Dr. Barry about her testimony and challenge her conclusions.

{23}    We hold that Defendant's confrontation rights were not violated and Defendant failed to demonstrate how Dr. Barry's testimony prejudiced his defense. Accordingly, Defendant's trial counsel was not ineffective for failing to object to Dr. Barry's testimony.

**C.    The State Presented Sufficient Evidence to Support the Jury Verdict of Deliberate First-Degree Murder**

{24}    Defendant argues that there was insufficient evidence of his intent to kill Martinez because his actions were impulsive and in reaction to Martinez pulling a gun on him. When reviewing a challenge to the sufficiency of the evidence, we review the

13

evidence introduced at trial to determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314. We view the evidence in the light most favorable to the verdict, resolving all conflicts and indulging all inferences in favor of the verdict. *State v. Apodaca*, 1994-NMSC-121, ¶ 3, 118 N.M. 762, 887 P.2d 756. "We will not substitute our judgment for that of the fact-finder, nor will we re-weigh the evidence." *State v. Treadway*, 2006-NMSC-008, ¶ 7, 139 N.M. 167, 130 P.3d 746 (citations omitted). "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

**{25}** The jury was correctly instructed that to find Defendant guilty of first-degree murder by a deliberate killing, the State was required to establish that

1. The defendant killed Celso Martinez;

2. The killing was with the deliberate intention to take away the life of Celso Martinez;

3. The defendant did not act in self defense;

4. This happened in New Mexico on or about the 30th day of November, 2007.

14

A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

The jury was also instructed on self-defense:

Evidence has been presented that the defendant killed Celso Martinez in self defense.

The killing is in self defense if:

1.    There was an appearance of immediate danger of death or great bodily harm to the defendant as a result of Celso Martinez threatening the defendant with a gun;

2.    The defendant was in fact put in fear by the apparent danger of immediate death or great bodily harm and killed Celso Martinez because of that fear; and

3.    A reasonable person in the same circumstances as the defendant would have acted as the defendant did.

The burden is on the state to prove beyond a reasonable doubt that the defendant did not act in self defense. If you have a reasonable doubt as to whether the defendant acted in self defense, you must find the defendant not guilty.

{26}    The State claimed that Defendant killed Martinez because Martinez was

15

harassing Archuleta and Archuleta was failing to stand up for himself. There was evidence that approximately two weeks before the shooting, Martinez assaulted Archuleta on more than one occasion and harassed Archuleta's family. Hernandez testified that Archuleta was afraid of Martinez. Archuleta testified that when Hernandez and Defendant returned to Ortega's house, she told Archuleta that his "problem was taken care of and [he] didn't have to worry anymore." Archuleta also said he heard Defendant say he shot Martinez with "[a] few shots in the head and a few in the chest." Hernandez and Archuleta both testified they had a gun on the morning of the shooting, and Archuleta said he left it in his car or gave it to Hernandez. Ortega testified he overheard Defendant talking about "whooping them or something" and "[t]aking care of it." Loya testified that Hernandez told him they were "about to go merk some fool."

{27} In addition to this evidence, a reasonable jury could have also rejected Defendant's claim of self-defense. First, Defendant initially told police he knew nothing about the shooting and then later confessed. Second, the evidence showed the victim was shot four or five times, and this could reasonably be viewed as contradictory to Defendant's claim that the gun went off while the two men struggled for control. Finally, Defendant made several statements that could be taken by the

16

jury as an admission of guilt such as "now I got to deal with the fact I have another man's blood on my hands that I had no right to take" and "[i]f I could take that day back, I would rather have changed places so I wouldn't have to deal with the guilt and with myself."

{28}  This evidence, when viewed as a whole, is sufficient to support the jury's finding that Defendant intended to kill Martinez and did not act in self-defense. The jury was free to reject Defendant's version of the events. Accordingly, we affirm Defendant's conviction.

**D.    There Was No Cumulative Error**

{29}  Finally, Defendant argues that cumulative errors on the part of the district court render the verdict inherently unreliable. "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *State v. Roybal*, 2002-NMSC-027, ¶ 33, 132 N.M. 657, 54 P.3d 61. "Where there is no error to accumulate, there can be no cumulative error." *State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P. 3d 328 (alteration, internal quotation marks, and citation omitted). Because we have found that the district court did not err when it admitted Defendant's confession, that Defendant's counsel was not ineffective for

failing to object to the testimony of Dr. Barry, and that there was sufficient evidence to support the jury's verdict, we reject Defendant's claim of cumulative error.

**III.    CONCLUSION**

{30}    For the foregoing reasons, we affirm Defendant's conviction for first-degree murder.

{31}    **IT IS SO ORDERED.**

_____
**PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**

_____
**JUDITH K. NAKAMURA, Chief Justice**

_____
**CHARLES W. DANIELS, Justice**

_____
**BARBARA J. VIGIL, Justice**

18

_____

**GARY L. CLINGMAN, Justice**

19