32 A.3d 613

COMMONWEALTH of Pennsylvania, Appellee

v.

Stanley ROEBUCK, Appellant.

Supreme Court of Pennsylvania.

Argued April 12, 2011.

Decided Nov. 23, 2011.

David R. Crowley, Bellefont, for Amicus Curiae, PA Assoc. of Criminal Defense Lawyers & Public Defender Assoc. of PA.

Frankie C. Walker II, Pittsburgh, for Stanley Roebuck.

Jeffrey Michael Murray, Allegheny County Public Defender's Office, for Appellant Amicus Curiae, Allegheny County Public Defender's Office.

Francesco Lino Nepa, Michael Wayne Streily, Pittsburgh, Allegheny County District Attorney's Office, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## OPINION

Justice SAYLOR.

In this appeal, we consider whether it is possible, as a matter of law, to be convicted as an accomplice to third-degree murder.

The complete factual background is somewhat cumbersome. For present purposes, it is enough to say the Commonwealth presented evidence that the victim was lured to an apartment complex, where he was ambushed, shot, and mortally wound-

ed. Appellant participated, with others, in orchestrating the events, but he did not shoot the victim.[1]

For his role, Appellant was charged with, among other offenses, murder of the third degree. *See* 18 Pa.C.S. § 2502(c). As he did not physically perpetrate the homicide, the Commonwealth relied upon accomplice theory, which is codified in Section 306 of the Crimes Code along with other complicity-based accountability principles. *See id.* § 306 (entitled "Liability for conduct of another; complicity" and establishing the terms of legal accountability for the conduct of another). The matter proceeded to a bench trial, and a verdict of guilt ensued.

On appeal, Appellant argued that there is no rational legal theory to support accomplice liability for third-degree murder. He rested his position on the following syllogism: accomplice liability attaches only where the defendant *intends* to facilitate or promote an underlying offense; third-degree murder is an *unintentional* killing committed with malice; therefore, to adjudge a criminal defendant guilty of third-degree murder as an accomplice would be to accept that the accused *intended* to aid an *unintentional* act, which is a logical impossibility.

The Superior Court did not directly refute either of the two premises underlying Appellant's argument,[2] but it differed with the conclusion. Initially, the court recognized that the complicity statute defines "accomplice" in terms of intentional promotion or facilitation of "the commission of the offense."

1. Some of the Commonwealth's supportive evidence, in the above regards, was of a circumstantial nature. Our present review, however, is limited to the legal issue on which the appeal was allowed—we are not undertaking review of the sufficiency of the evidence to support necessary inferences.

2. *See Commonwealth v. Roebuck,* No. 1555 WDA 2007, *slip op.* at 7, 976 A.2d 1214 (Pa.Super. May 4, 2009) (relating that an accomplice is criminally liable for the acts of another if he agrees, aids, or attempts to aid such other person in either planning or committing a crime and acts with the intent of promoting or facilitating the commission of that offense, 18 Pa.C.S. § 306(c)(1)(ii)); *id.* at 8 (explaining that third-degree murder is a killing done with malice (albeit without the specific intent to kill required to support murder of the first degree), 18 Pa.C.S. § 2502(c)).

*Id.* § 306(c)(1). Nevertheless, the court highlighted the following statutory prescription pertaining to the requisite *mens rea* (or mental state):

When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.

*Id.* § 306(d). As the "kind of culpability" predicate to third-degree murder entails malice, *see, e.g., Commonwealth v. Santos,* 583 Pa. 96, 101–02, 876 A.2d 360, 363 (2005),[3] the court reasoned that, "[i]f one participates in a criminal act, which also demonstrates malice, and if a life is taken, one can be convicted of ... third-degree murder vicariously." *Roebuck,* No. 1555 WDA 2007, *slip op.* at 14–15. In effect, the intermediate court held that complicity theory applies in third-degree murder scenarios—even if homicide was not the intended underlying crime—where the intentional acts demonstrate a disregard for human life amounting to malice. *Accord Commonwealth v. Flanagan,* 578 Pa. 587, 594 n. 2, 607, 610 n. 13, 854 A.2d 489, 493 n. 2, 501, 503 n. 13 (2004).[4] Upon the appellate review of this and other claims, the judgment of sentence was affirmed.

3. Malice is said to comprehend "not only a particular ill-will, but every case where there is a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Commonwealth v. Ludwig,* 583 Pa. 6, 21, 874 A.2d 623, 632 (2005) (quoting *Commonwealth v. Drum,* 58 Pa. 9, 15 (1868)). Accordingly, the concept is often referred to in judicial decisions and the literature as giving rise to abandoned-heart, depraved-heart, or depraved-mind murder. *See, e.g.,* 40 C.J.S. *Homicide* § 42 (2011).

4. Applying its holding to the present case, the court had little difficulty in concluding that Appellant demonstrated the requisite malice by participating in a scheme designed, at a minimum, to stage an armed confrontation with the victim. *See Santos,* 583 Pa. at 102, 876 A.2d at 364 ("[M]alice is present under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for 'an unjustified and extremely high risk that his actions *might* cause death or serious bodily harm.' " (quoting *Commonwealth v. Young,* 494 Pa. 224, 228, 431 A.2d 230, 232 (1981) (emphasis in original))).

■ This discretionary appeal was allowed to resolve Appellant's legal challenge to the application of complicity theory to murder of the third degree. *See Commonwealth v. Roebuck*, 606 Pa. 290, 291, 997 A.2d 1150, 1150 (2010) (*per curiam* ). Our scope of review of such matters is plenary, and our standard of review is *de novo. See, e.g., Commonwealth v. Cousin*, 585 Pa. 287, 294, 888 A.2d 710, 714 (2005).

Presently, Appellant maintains that accomplice liability for third-degree murder is a legal anomaly in view of his impossibility syllogism. In passing, Appellant observes that Section 306 of the Pennsylvania Crimes Code was derived from the Model Penal Code. *See* Model Penal Code § 2.06 (1962) (the "MPC" or the "Code"). Without developing how the Code actually treats accomplice liability, Appellant's brief segues into a discussion of a series of Superior Court opinions, as well as decisions from other jurisdictions, disapproving convictions based on grounds of logical and/or legal impossibility.[5] Most of these cases involve criminal attempt and conspiracy, and Appellant acknowledges that the accomplice theory is distinct. Nevertheless, he urges that the same impossibility rationale should apply. *See* Brief for Appellant at 18–19 ("[T]he conclu-

5. *See* Brief for Appellant at 15–16 & n. 3 (citing, *inter alia, Commonwealth v. Clinger,* 833 A.2d 792, 796 (Pa.Super.2003) (holding that a defendant could not be convicted of conspiracy to commit third-degree murder, because "[l]ogic dictates ... that it is impossible for one to intend to commit an unintentional act"), *Commonwealth v. Barnyak,* 432 Pa.Super. 483, 493 n. 5, 639 A.2d 40, 45 n. 5 (1994) (finding that there is no crime of attempted third-degree murder), *Commonwealth v. Spells,* 417 Pa.Super. 233, 237 n. 5, 612 A.2d 458, 460 n. 5 (1992) (same), and *Commonwealth v. Griffin,* 310 Pa.Super. 39, 50–51, 456 A.2d 171, 177 (1983) ("[A]n attempt to commit second or third degree murder would seem to require proof that a defendant *intended* to perpetrate an *unintentional* killing-which is logically impossible." (emphasis in original))); *see also id.* at 19–21 (citing, among other decisions from other jurisdictions, *State v. Foster,* 202 Conn. 520, 522 A.2d 277, 281 (1987) (indicating that a defendant "cannot attempt or conspire to commit an offense that requires an unintended result"), and *State v. Baca,* 124 N.M. 333, 950 P.2d 776, 788 (1997) (holding that conspiracy to commit depraved-mind murder is not a cognizable offense)). *See generally* Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law 466 (1972) (indicating that "there is no such thing as a conspiracy to commit a crime which is defined in terms of recklessly or negligently causing a result"), *quoted in Palmer v. People,* 964 P.2d 524, 529 (Colo.1998) (*en banc* ).

sion should be the same, since accomplice liability only attaches when one intends to aid another person in a crime, and, if such crime is third degree murder, the person aiding will be furthering an unintentional crime, which is logically impossible.").

Appellant's most direct support derives from his citation to a subsequently disapproved plurality decision of the New Hampshire Supreme Court. *See id.* at 21 (citing *State v. Etzweiler*, 125 N.H. 57, 480 A.2d 870, 874 (1984) (plurality) (reasoning that "an accomplice's liability ought not extend beyond the criminal purposes that [the accomplice] shares"), *superseded by* N.H.Rev.Stat. Ann. § 626:8 (West 2001), *and disapproved by State v. Anthony*, 151 N.H. 492, 861 A.2d 773 (2004)). In his discussion, he also alludes to a concurring opinion authored by former Justice Souter of the United States Supreme Court, who, at the time, was a Justice of the state supreme court. In this responsive opinion, Justice Souter criticized the Model Penal Code's description of the culpability requisite to accomplice liability—after which Section 306(d) of the Pennsylvania Crimes Code was modeled—as he believed that it "fails to give any comprehensible, let alone fair, notice of intended effect[.]" *Etzweiler*, 480 A.2d at 877 (Souter, J., concurring).

Finally, Appellant references the dissent in a decision of this Court which discussed conspiracy to commit third-degree murder. *See Commonwealth v. Weimer*, 602 Pa. 33, 41–53, 977 A.2d 1103, 1107–15 (2009) (Todd, J., joined by Saylor, J.). Appellant suggests that this responsive opinion also confirms his impossibility rationale. *See id.* at 48, 977 A.2d at 1112 ("[T]o be guilty of conspiracy to commit third-degree murder, an individual would have to intend to commit an unintentional killing, a logical impossibility.").

In reply and in relevant part, the Commonwealth posits that accomplice liability readily pertains to murder of the third degree. Consistent with the Superior Court's reasoning, the Commonwealth explains that it is the shared criminal intent motivating the underlying conduct (here, designing to stage a very dangerous altercation) which establishes the requisite

criminal culpability. The Commonwealth offers, as an illustration, the Superior Court's decision in *Commonwealth v. Kimbrough*, 872 A.2d 1244 (Pa.Super.2005) (*en banc*) (undertaking sufficiency review and upholding a judgment of sentence for murder of the third degree based on accomplice liability). *See* Brief for Appellee at 24–26 ("It is obvious from the Superior Court's decision in *Kimbrough* that because the defendant, acting with the requisite malice, had put in motion the events that led to the victim's killing, he was legally responsible for the actions of the individual who actually fired the gun that killed the victim."). According to the Commonwealth, it is both rational and sensible to hold one who aids another in malicious conduct to account to the same degree as the principal for foreseeable consequences of the wrongful actions. *See id.* at 23–24 ("If it was not necessarily the principal actor's intention to kill anyone and yet he can still be found guilty of third-degree murder ..., why is it that his accomplice cannot be guilty of the same thing when both of them engaged in the same plan to act violently?").[6]

At the outset, it certainly is possible for a state legislature to employ complicity theory to establish legal accountability on the part of an accomplice for foreseeable but unintended results caused by a principal. Indeed, this was the express design of the American Law Institute's widely influential Model Penal Code.

To provide appropriate context in considering the MPC's treatment of complicity theory, it is helpful to review some of the Code's core theoretical underpinnings. Also impacting on this discussion, the MPC does not employ the term "malice" in its treatment of the crime of murder, but rather, expresses the concept as "reckless[ness] under circumstances manifesting extreme indifference to the value of human life." MODEL PENAL CODE § 210.2(1)(b).[7] To streamline the discourse, and

6. Also aiding our review, *amicus* briefs have been submitted by Pennsylvania Association of Criminal Defense Lawyers and Public Defender Association of Pennsylvania, as well as the Allegheny County Law Office of the Public Defender.

7. *Compare Commonwealth v. Young*, 494 Pa. 224, 228 n. 3, 431 A.2d 230, 232 n. 3 (1981) (finding malice in "the type of grossly reckless

particularly since Appellant's impossibility logic is grounded on the presence of unintended consequences flowing from an intentional act—and thus extends to any crime in which the *mens rea* pertaining to a necessary result is recklessness— much of the discussion below is framed in terms of reckless- ness.[8]

## I.  The Model Penal Code

### A.  The Code Generally

■  In addressing the terms of the Model Penal Code, it is important to bear in mind that the Code employs an elements approach to substantive criminal law, which recognizes that a single offense definition may require different culpable mental states for each objective offense element.  *See id.* § 2.02, Explanatory Note ("The requirement of culpability applies to each 'material element' of the crime.").[9]  The MPC further narrows *mens rea* analysis by pruning from the lexicon a plethora of common-law culpability terms, leaving four core terms.  *See id.* § 2.02(1) (indicating, subject to one express exception, that "a person is not guilty of an offense unless he

conduct which [the actor] should have known was likely to result in serious bodily harm or death to another").  The reasons for this difference are touched upon below and include the drafters' desire to simplify offense formulations by curtailing the range of descriptions for culpable mental states deriving from the common law.

8.  This frame of reference also serves as the common ground among the many cases touching on the subject, including those cited by Appellant, pertaining to a wide range of reckless-result offenses, such as conspira- cy to commit third-degree arson, conspiracy to commit reckless man- slaughter, and conspiracy to commit reckless assault.  *See* Brief for Appellant at 19–21 (citing, among other cases, *State v. Beccia*, 199 Conn. 1, 505 A.2d 683, 685 (1986), *Palmer*, 964 P.2d at 529–531, and *State v. Donohue*, 150 N.H. 180, 834 A.2d 253, 258 (2003)).

9.  *See generally* Paul H. Robinson & Jane A. Grall, *Element Analysis in Defining Criminal Liability: The Model Penal Code and Beyond*, 35 STAN. L.REV. 681, 699 (1983) ("The Code's definition of each culpability term with respect to each kind of objective element of an offense reflects a fundamental and critical principle of the Code's culpability scheme: *Different degrees of culpability may be required with respect to different elements of the same offense.*" (emphasis in original)); *id.* at 703 ("Element analysis provides the comprehensiveness, clarity, and preci- sion needed to give fair notice and to limit governmental discretion, as required by the legality principle.").

acted purposely, knowingly, recklessly or negligently, as the law may require"); *see also* Robinson & Grall, *Element Analysis*, 35 STAN. L.REV. at 692–93.

Conceptually, the MPC also recognizes three objective categories of offense elements—conduct, attendant circumstances, and result. *See* MODEL PENAL CODE § 2.02, cmt. 1, at 229. The Code frequently distinguishes among these offense-element categories in its various prescriptions regarding which of the four levels of culpability must be established for any given offense element. *See generally id.* at 229–30 ("The question of which level of culpability suffices to establish liability must be addressed separately with respect to each material element, and will be resolved either by the particular definition of the offense or the general provisions of [Section 2.02].").[10]

The Model Penal Code has had its share of detractors, and, certainly, it does not provide perfect formulations. For example, as relevant to Appellant's arguments, the Code has been criticized for failing to provide an adequate description and overlay relating the four levels of culpability (purposeful, knowing, reckless, negligent) to the objective element categories (conduct, attendant circumstances, result) in the context of particular offense elements. *See, e.g.,* Robinson & Grall, *Element Analysis*, 35 STAN. L.REV. at 706–07. Such criticism has been leveled in the accomplice-liability setting. *See, e.g., id.* at 739 ("The greatest flaw in the Model Penal Code provision [directed to accomplice liability], and those provi-

---

**10.** For example, in defining "purposely," the Code indicates:

A person acts purposely with respect to a material element of an offense when:

(i) if the element involves the nature of his *conduct or* a *result* thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

(ii) if the element involves the *attendant circumstances,* he is aware of the existence of such circumstances or he believes or hopes that they exist.

MODEL PENAL CODE § 2.02(2)(a) (emphasis added).

Parenthetically, the MPC also offers default culpability rules designed to mitigate ambiguities when a lawmaking body fails to specify a *mens rea* requirement or indicate whether a stated culpability term applies to one or to all of the objective elements of an offense. *See id.* § 2.02(3), (4). *See generally* Robinson & Grall, *Element Analysis*, 35 STAN. L.REV. at 693–94.

sions modeled after it, is their failure to specify all of the culpability requirements of the substantive offense that the accomplice must satisfy."). We bear these observations in mind in proceeding to address the Code's treatment of complicity theory.

## B. MPC Treatment of Accomplice Liability

The legal accountability of accomplices for the conduct of others is treated in 2.06 of the Code. *See* MODEL PENAL CODE § 2.06(2)(c) ("A person is legally accountable for the conduct of another person when ... he is an accomplice of such other person in the commission of the offense."). Two material passages follow, developing the meaning of the term "accomplice" and the requisite *mens rea*, as relevant to the present case:

(3) A person is an accomplice of another person in the commission of an offense if ... with the purpose of promoting or facilitating the commission of the offense, he ... aids or agrees or attempts to aid such other person in planning or committing it[.]

(4) When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.

*Id.* § 2.06(3), (4).

Section 206(4) thus prescribes that an accomplice may be held legally accountable where he is an "accomplice in the conduct"—or, in other words, aids another in planning or committing the conduct with the purpose of promoting or facilitating it—and acts with recklessness (*i.e.,* the "kind of culpability ... sufficient for the commission of" a reckless-result offense).[11]

To the extent any aspect of this accountability scheme is unclear, ample clarification is provided in the explanatory note

---

11. Under the MPC, where the result element requires a higher level of culpability, this extends to accomplices as well. For example, within the context of the Pennsylvania Crimes Code, first-degree murder requires of a principal the specific intent to kill; thus, specific intent is

and commentary. As a threshold matter, the commentary explains that the term "commission of the offense," as used in Section 2.06(3), focuses on the *conduct*, not the result. *See id.* § 2.06, cmt. 6(b), at 310 ("Subsection 3(a) requires that the actor have the purpose of promoting or facilitating the commission of the offense, i.e., that *he have as his conscious objective the bringing about of conduct* that that the Code has declared to be criminal[.]" (emphasis added)).[12] This diffuses any impression that an accomplice must always intend results essential to the completed crime. *See Wheeler,* 772 P.2d at 103 (explaining that the " 'intent to promote or facilitate the commission of the offense' ... does not include an intent that death occur even though the underlying crime ... has death as an essential element" (citation and quotation marks omitted)). The commentary then points to the fourth subsection as supplying the essential culpability requirement, as follows:

> One who solicits an end, or aids or agrees to aid in its achievement, is an accomplice in whatever means may be employed, insofar as they constitute or commit an offense

also required to support accomplice liability to first-degree murder. *See, e.g., Commonwealth v. Markman,* 591 Pa. 249, 269 n. 8, 916 A.2d 586, 597 n. 8 (2007); *accord State v. Garnica,* 209 Ariz. 96, 98 P.3d 207, 213–14 (Ariz.Ct.App.2004) (making the same point under Arizona law). The interconnection between accomplice *mens rea* and the mental state required of a principal actor represents an important restraint on accountability. In terms of such limiting principles, it is also necessary to determine whether the principal has taken actions beyond those that the accomplice intended. *See* Sanford H. Kadish, *Complicity, Cause and Blame: A Study in the Interpretation of Doctrine,* 73 CAL. L.REV. 323, 348 (1985). In such instances, it cannot be said that the accomplice intended to bring about the conduct, and therefore, any criminal liability for the result would have to rest on some other ground.

12. *Accord Riley v. State,* 60 P.3d 204, 213–14 (Alaska Ct.App.2002) (discussing the relevant commentary); *State v. Nelson,* 214 Ariz. 196, 150 P.3d 769, 772 (Ariz.Ct.App.2007) ("[F]or accomplice liability to exist, [the Code-based governing statute] only requires proof of intent to promote or facilitate the *conduct* of another, not proof of intent to promote or facilitate the unintended result of the conduct."); *People v. Wheeler,* 772 P.2d 101, 103 (Colo.1989) (*en banc*) ("The 'intent to promote or facilitate the commission of the offense' of which the complicity statute speaks is the intent to promote or facilitate the act or conduct of the principal.").

fairly envisaged in the purposes of the association. But *when a wholly different crime has been committed, thus involving conduct not within the conscious objectives of the accomplice, he is not liable for it unless the case falls within the specific terms of Subsection (4).*

MODEL PENAL CODE § 2.06, cmt. 6(b), at 311 (emphasis added). According to the commentary, the purport of the fourth subsection is to hold the accomplice accountable for contributing to the conduct to the degree his culpability equals what is required to support liability of a principal actor.[13]

Again, we acknowledge the criticisms that the Model Penal Code lacks clarity, particularly in the arena of accomplice

---

**13.** The full text of the relevant passage is as follows:

*Result Elements.* Subsection (4) makes it clear that complicity in conduct causing a particular criminal result entails accountability for that result so long as the accomplice is personally culpable with respect to the result to the extent demanded by the definition of the crime. Thus, if the accomplice recklessly endangers life by rendering assistance to another, he can be convicted of manslaughter if a death results, even though the principal actor's liability is at a different level. In effect, therefore, *the homicidal act is attributed to both participants, with the liability of each measured by his own degree of culpability toward the result.*

The most common situation in which Subsection (4) will become relevant is where unanticipated results occur from conduct for which the actor is responsible under Subsection (3). *His liability for unanticipated occurrences rests upon two factors: his complicity in the conduct that causes the result, and his culpability towards the result to the degree required by law, that makes the result criminal.* Accomplice liability in this event is thus assimilated to the liability of the principal actor[.] ...

*This formulation combines the policy that accomplices are equally accountable within the range of their complicity with the policies underlying those crimes defined according to the results.* It is thus a desirable extension of accomplice liability beyond the principles stated in Subsection (3).

MODEL PENAL CODE § 2.06, cmt. 7, at 321–22 (emphasis added); *accord id.* § 2.06, Explanatory Note; *Garnica*, 98 P.3d at 212 ("Section 2.06(4) of the Model Penal Code was intended to make clear that an accomplice must nonetheless meet the required mental state for the offense under the statute."); *Riley*, 60 P.3d at 221 ("The Model Penal Code was written to impose accomplice liability for crimes involving unintended injury or death if the accomplice intentionally promotes or facilitates the *conduct* that produces the injury or death, even though the accomplice did not intend this result. Among the states that have complicity statutes based on the Model Penal Code, most courts have interpreted their statutes this way." (emphasis in original)).

liability. Most of the examples referenced by commentators, however, entail more nuanced factual scenarios. *See, e.g.*, Robinson & Grall, *Element Analysis*, 35 STAN. L.REV. at 740–41. To the degree courts and commentators have suggested that the MPC formulation is unduly ambiguous in imposing legal accountability of accomplices for unintended consequences of reckless conduct, we respectfully disagree. We also differ with the few decisions which suggest that the Code's scheme dictates that an accomplice's liability cannot extend to results beyond those within the contemplation of shared criminal purposes. *See, e.g., Etzweiler*, 480 A.2d at 874. Indeed, to our knowledge, the only jurisdictions which had credited such position have subsequently corrected it. *See Anthony*, 861 A.2d at 775 (reflecting the New Hampshire Supreme Court's explanation that its *Etzweiler* decision was in error, *inter alia*, because it overlooked the MPC commentary).[14]

For the above reasons, at least under the regime of the Model Penal Code, holding an accomplice criminally liable for a result requiring a mental state of recklessness is not theoretically impossible, as Appellant asserts. To the contrary, it is precisely the norm. *Accord Riley*, 60 P.3d at 221 ("With respect to offenses that require proof of a particular result, the government must prove that the accomplice acted with the culpable mental state that applies to that result, as specified in the underlying statute.").[15]

14. *See also Riley*, 60 P.3d at 207 ("We were wrong when we said ... that liability for ... criminal homicide under a complicity theory always requires proof that the defendant intended to cause ... the death, even though the underlying crime requires proof of only a lesser culpable mental state[.]"); *Weidler v. State*, 624 So.2d 1090, 1091–92 (Ala.Crim.App.1993) (disapproving a broad reading of a previous decision which would inappropriately render complicity inconsistent with recklessness).

15. *See Riley*, 60 P.3d at 211 ("The rule at common law is that when a person purposely assists or encourages another person to engage in conduct that is dangerous to human life or safety, and unintended injury or death results, it does not matter which person actually caused the injury or death by their personal conduct.") (citing, *inter alia*, ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 739–40 (3d ed.1982)). The Model Penal Code tempered the common law—which held accom-

## II.  The Pennsylvania Crimes Code

As Appellant indicates (albeit lacking the above elaboration), Section 306 of the Pennsylvania Crimes Code derives from the Model Penal Code. *See* 18 Pa.C.S. § 306, cmt.  Furthermore, the provisions of the Crimes Code establishing legal accountability for accomplice conduct are materially identical to the corresponding terms of Section 206 of the MPC in all relevant respects. *Compare id.* § 306(c), (d), *with* MODEL PENAL CODE § 206(3), (4).

We recognize that the Crimes Code does not contain the wealth of collateral explanatory material which accompanies the Model Penal Code, including the latter's extensive notes and commentaries.  Nevertheless, we believe the text of the Pennsylvania statute is clear enough.  In terms identical to those of Section 206 of the MPC, Section 306(d) of the Crimes Code directs the focus, for result-based elements, to the level of culpability required of a principal. *See* 18 Pa.C.S. § 306(d). *See generally Riley,* 60 P.3d at 214 (explaining that a "great majority" of judicial decisions have followed the MPC in holding that an accomplice must not necessarily intend to cause the prohibited result (citations omitted)).  In the present factual scenario, the purport is to avoid elevating a recklessness-oriented culpability requirement to a purposeful one relative to an accomplice. *Accord Anthony,* 861 A.2d at 775 ("[I]f the offense's mental state with respect to the result is something less than purposeful, the State need only establish the lesser *mens rea* on the part of the accomplice to prove him or her guilty of the offense.").  The policy basis for such treatment is readily discernable,[16] and a homicide committed

plices automatically accountable for any and all objectively foreseeable consequences of a joint unlawful endeavor—by basing accountability on conduct and the level of the accomplice's personal, culpable mental state. *See id.* at 220–21.

**16.** *See, e.g., Foster,* 522 A.2d at 284 ("[B]ecause accessorial liability is not a distinct crime, but only an alternative means by which a substantive crime may be committed, it would be illogical to impose liability on the perpetrator of the crime, while precluding liability for an accessory, even though both possess the mental state required for the commission of the crime."); *Riley,* 60 P.3d at 208 (reflecting the same policy rationale); *Weidler,* 624 So.2d at 1091 ("It is both logically and legally

with the degree of recklessness predicate to murder provides a paradigmatic example.

Appellant's position garners its only ostensible strength from his attempt to read Section 306(c) in isolation. We are obliged, however, to read statutes in a manner giving effect to all of their provisions, *see* 1 Pa.C.S. § 1922(2), which, in the present case, includes Section 306(d).[17] Moreover, to the extent there is any tension between Sections 306(c) and (d), the latter is the more specific term relative to offenses containing result-based elements; therefore, it controls. *See id.* § 1933 (relating the rule of construction that the particular controls over the general); *cf.* MODEL PENAL CODE § 2.06, cmt. 7, at 321–22 (explaining, with regard to the Code's analogues to Sections 306(c) and (d), that the latter functions as "a desirable extension of accomplice liability beyond the principles stated in" the former).

### III. Attempt and Conspiracy

We turn now to Appellant's citations to judicial decisions involving attempt and conspiracy. In this regard, we appreciate that many of these hold that persons cannot attempt or conspire to commit offenses that require unintended results. *See supra* note 5. It is beyond the scope of this opinion for this Court to address whether such decisions are consistent with Pennsylvania statutory law.[18] Here, we observe only that these lines of cases are materially distinguishable, given that the culpability requirements are different. *See, e.g., Palmer,* 964 P.2d at 528 ("[C]onspiracy, attempt, and complicity are

consistent to impose liability on one whose conduct aids or encourages another who *is* aware of and who consciously disregards a substantial risk of death." (emphasis in original)).

17. *Accord Garnica,* 98 P.3d at 212 ("If we were to read [Arizona's analogue to Section 306(c)] to preclude offenses with a reckless mens rea, it would render void that portion of [the analogue to Section 306(d)] that invokes accomplice liability for one 'who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense.' Such a construction is not favored under the law.").

18. As Appellant observes, Madame Justice Todd, joined by this author, has expressed a position on the subject as to conspiracy. *See Weimer,* 602 Pa. at 41–53, 977 A.2d at 1107–15 (Todd, J., dissenting).

distinct legal principles with different requirements for mental culpability.").[19]

■ To commit the crime of criminal attempt, a person must act with "intent to commit a specific crime." 18 Pa.C.S. § 901(a) (emphasis added). Therefore, in the attempt setting, the *mens rea* level of "intentionally" attaches to the result (for example, a homicide).[20] This is materially different from the accomplice scenario—in which the required culpability derives from the mental state required for liability of a principal and may be of a lesser degree. *See supra* part I.

The conspiracy decisions of other courts referenced by Appellant likewise accept that conspiracy encompassed the intent to cause a particular result, cast in terms of the "object."[21] Again, this focus on result serves as the material

19. *Accord Foster*, 522 A.2d at 281 ("Attempt and conspiratorial liability differ substantially from the liability imposed on an accessory"); *Donohue*, 834 A.2d at 257 ("[C]ases involving accomplice liability for reckless conduct ... are distinguishable from conspiracy to commit a reckless act."); *Baca*, 950 P.2d at 787 ("Other scholars have agreed that it is important to make a clear distinction between liability as an accomplice and liability as a coconspirator.").

20. This point is made clearer from the Crimes Code's provisions establishing the general requirements of culpability. *See* 18 Pa.C.S. § 302. For offense elements involving the nature of the actor's conduct or a result thereof, the statute prescribes that a person acts intentionally with respect to a material element of an offense when "it is his conscious object ... to cause such a *result*." *Id.* § 302(b)(1)(i) (emphasis added); *see, e.g., Commonwealth v. Hall*, 574 Pa. 233, 240, 830 A.2d 537, 541 (2003) (explaining that, to be guilty of criminal attempt, a defendant's conscious objective must be to cause the result necessary to the substantive crime).

21. *See generally* 15A C.J.S. *Conspiracy* § 112 (2011) ("A conspiracy is a specific intent crime, requiring the intent to agree or conspire and the intent to commit the offense which is object of the conspiracy." (footnote omitted)); WAYNE R. LaFAVE, 2 SUBST. CRIM. L. § 12.2(c)(2) (2d ed.2010) ("[I]t may generally be said that the mental state required [for conspiracy] is an intent to achieve a particular result which is criminal or which though noncriminal is nonetheless covered by the law of conspiracy." (footnotes omitted)).

There is at least one difference between the treatment of conspiracy as between the MPC and the Crimes Code, as the former does not require an overt act to support conspiracy to commit a first- or second-degree felony, whereas, the latter so requires. *Compare* MODEL PENAL CODE § 5.03(5), *with* 18 Pa.C.S. § 903(e). *See generally* Arthur A. Murphy,

distinction from the accomplice scenario, where the focus is on the underlying conduct. *See supra* parts I and II.

■ The differences between attempt and conspiracy, on the one hand, and complicity on the other, are reflected, amply, in the decisions from other courts, including several of those cited by Appellant. Most, if not all, have held that a defendant can be convicted as an accomplice to an offense encompassing recklessness as the mental state pertaining to the result.[22] Again, accomplice liability does not require the defendant to have the conscious objective to cause a particular result when such an outcome is an element of the offense.

This point was cogently made by the Connecticut Supreme Court in *Foster*. There, the appellant had argued that accomplice to criminally negligent homicide was not a cognizable offense under Connecticut law, because, like attempt or conspiracy liability, such a crime would require finding that the defendant intended to aid an unintended result—a logical impossibility.[23] The *Foster* court disagreed, reasoning, in relevant part, as follows:

> [T]o be guilty of attempt, a defendant's conscious objective must be to cause the result which would constitute the substantive crime. A person cannot attempt to commit a crime which requires that an unintended result occur, such as involuntary manslaughter, because it is logically impossible for one to intend to bring about an unintended result.

*Pennsylvania Conspiracy Law: The Basic Jurisprudence*, 97 DICK. L.REV. 83, 91–92 (1992). This particular distinction is not significant, however, to our discussion here concerning requisite mental states.

22. *See Palmer*, 964 P.2d at 530–31 (distinguishing conspiracy from complicity theory relative to reckless- or negligent-result offenses); *Baca*, 950 P.2d at 786–87 (same); *Nelson*, 150 P.3d at 772 (distinguishing attempt crimes form accomplice liability for such purposes).

23. Although the Connecticut statute involved negligence, as opposed to recklessness, as the culpability level attaching to the result, such circumstances fit within Appellant's impossibility logic, since they are also unintended-result cases. *Accord Nelson*, 150 P.3d at 771 ("Nothing in [the governing statute] suggests ... that a different rule for accomplice liability should apply to offenses with a culpable mental state of criminal negligence."); *Garnica*, 98 P.3d at 210 n. 4 (observing that "[a] reckless offense is one form of 'unintentional' offenses").

Similarly, to be guilty of conspiracy, the defendant, upon entering an agreement, must intend that his conduct achieve the requisite criminal result. When the substantive crime requires an unintended result, a person cannot conspire to commit that crime because it is logically impossible to agree to achieve a specific result unintentionally.

Contrary to the [appellant's] assertions, and unlike attempt or conspiratorial liability, accessorial liability does not require that a defendant act with the conscious objective to cause the result described by a statute.

\* \* \*

[The accomplice statute] merely requires that a defendant have the *mental state required for the commission of a crime* while intentionally aiding another.

*Foster,* 522 A.2d at 282–83 (citations and footnotes omitted; emphasis in original).

Consistent with the Model Penal Code, the Pennsylvania Crimes Code, and the weight of the authorities, the court thus held that a defendant may be held liable for a criminally negligent act under complicity theory "if he has the requisite culpable mental state for the commission of the substantive offense, and he intentionally aids another in the crime." *Id.* at 284.

## IV. The Impossibility Syllogism

In light of the above, it is apparent that the first premise of Appellant's impossibility syllogism embodies the erroneous proposition that the culpability requirement for accomplice liability is necessarily tied to a result (here, the killing). Again, Section 306(d) provides differently. The statute's reach simply is not confined to substantive crimes requiring a specific intention to bring about a particular result. *Accord id.* at 282. For offenses where a principal actor need not intend the result, it is also not necessary for the accomplice to do so.[24]

24. *Accord Foster,* 522 A.2d at 282 (explaining that "accessorial liability does not require that a defendant act with the conscious objective to cause the result described by a statute"); *Weidler,* 624 So.2d at 1091

## V. Summary and Holding

In summary, a conviction for murder of the third degree is supportable under complicity theory where the Commonwealth proves the accomplice acted with the culpable mental state required of a principal actor, namely, malice. In other words, the Pennsylvania Crimes Code legally, logically, and rationally imposes accomplice liability for depraved heart murder.

The judgment of the Superior Court is affirmed and jurisdiction is relinquished.

Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE, Justices BAER, TODD, and McCAFFERY join the opinion.

Justice EAKIN files a concurring opinion, in which Chief Justice CASTILLE joins.

Justice EAKIN, concurring.

I agree with the majority that, as a matter of law, one can be convicted of being an accomplice to third degree murder. The majority opinion recognizes the flaw in the second premise of Appellant's syllogism, which posits that third degree murder is an unintentional killing committed with malice. Third degree murder is not by definition an unintentional killing; it is a malicious killing without proof that the specific result intended from the actions of the killer was the death of the victim. A conviction for third degree murder only means the Commonwealth did not prove the defendant acted with a specific intent to kill. *See Commonwealth v. Meadows*, 567

("It is both logically and legally consistent to impose liability on one whose conduct aids or encourages another who *is* aware of and who consciously disregards a substantial risk of death." (emphasis in original)).

Based on the above, it is unnecessary to discuss the example offered by the Commonwealth, namely, the Superior Court's *Kimbrough* decision. It is sufficient to observe that the legal theory upon which the intermediate court relied was correct.

Pa. 344, 787 A.2d 312, 317 (2001) (quoting *Commonwealth v. Young*, 561 Pa. 34, 748 A.2d 166, 175 (1999) ("[T]o convict a defendant for third degree murder, the jury need not consider whether the defendant had a specific intent to kill, nor make any finding with respect thereto.")).

As Appellant's syllogism is based on a false premise, his argument fails. Indeed, an accomplice to third degree murder does not intend to aid an unintentional murder; he intends to aid a malicious act which results in a killing. Suppose an accomplice hands a gun to the principal and says "shoot that victim—I don't care if he dies or not, but shoot him." The principal shoots the victim in the leg, but the victim dies—it is classic third degree murder, there being no proof of specific intent to kill, but a clearly malicious act regardless of the consequences. The same logic that enables a murder charge against the principal binds the accomplice as well—both committed an intentional malicious act that resulted in the death of another, and both are guilty of the murder charge that follows.

Accordingly, I respectfully concur in result.

Chief Justice CASTILLE joins this opinion.