J-A01018-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| C.W., JUVENILE | |
| Appellant | No. 3470 EDA 2014 |

Appeal from the Dispositional Order November 5, 2014
In the Court of Common Pleas of Lehigh County
Juvenile Division at No(s): CP-39-JV-0000302-2014
SID NO. 41678445

BEFORE: LAZARUS, J., OTT, J., and FITZGERALD, J.[*]          **FILED JUNE 27, 2016**

CONCURRING AND DISSENTING MEMORANDUM BY FITZGERALD, J.:

I concur with the majority decision to affirm the denial of Appellant's suppression motion. I also agree the evidence was sufficient to establish Appellant was an accomplice to the harassment of N.G. However, I respectfully dissent from the majority's decision to affirm the adjudication of delinquency for ethnic intimidation. In my view, the juvenile court's findings do not support the conclusion that Appellant "with the intent of promoting or facilitating the offense" solicited, aided in, agreed to, or attempted to aid in planning or commission of that offense. **See** 18 Pa.C.S. § 306(b)(3), (c).

A review of the evidence presented at the adjudication hearing established the following. Approximately two days before the incident in

---

[*] Former Justice specially assigned to the Superior Court.

question, Appellant complimented N.G. on a deck of cards N.G. was shuffling. N.T. Adjudication Hr'g 10/15/14, at 132. N.G. described that interaction as "fairly positive." *Id.* N.G. had no prior contact with F.R. or J.W.

On the day in question, N.G was playing cards with his friend, G.S., in study hall, and G.Z. joined them at their table.[1] Before the events captured on the video recording, Appellant, J.W., and F.R. entered the study hall and were "hanging around [N.G.'s] table" and "messing around." *Id.* at 133. F.R. asked to see G.Z.'s cellphone. *Id.* F.R. ran out of the room with it, but returned and gave the phone back to G.Z. N.G. testified that he was not a target of this teasing. *Id.* at 134. Later, Appellant was "off to the side" of the group, asked to play in the card game, and, according to N.G., "wasn't doing anything harmful." *Id.* at 142.

The video recording, Commonwealth's Exhibit 1, showed the following. F.R's smartphone camera turns on and focuses on J.W. *See* Commonwealth's Ex. 1, at 00:01. Appellant is seen briefly either at the same table as N.G. N.T. at 97. F.R., who is holding the camera, narrates that the recording is a "smack cam," and F.R. and J.W. discuss whether it is part three or four. Commonwealth's Ex. 1 at 00:05. F.R. focuses the camera on N.G. and states "mop that shit." *Id.* at 00:21. J.W. strikes N.G.

_____

[1] As it is relevant to this appeal, N.G. and G.Z. are Caucasian, and G.S. is Hispanic. F.R. is Hispanic and J.W. and Appellant are African-American. The study hall was held in a cafeteria.

F.R. stands in place and narrates as J.W. runs away, laughing, down the hallway behind F.R. F.R. softly states "I'm about to jack his phone," then hands the camera to Appellant. *Id.* at 00:44. F.R. repeatedly uses the term "nigger" when referring to N.G. and G.Z.

Appellant continues recording as F.R. and J.W. stand back from N.G.'s table and F.R. approaches N.G. *Id.* at 00:44-00:58. F.R. plays with N.G.'s hair, and states he could be his daughter. Appellant can be heard laughing on camera. *Id.* at 01:00-01:10. F.R. and J.W. then stand around N.G. and G.Z. and ask for their cellphones. *Id.* at 01:17. Appellant begins moaning or sighing. *Id.* at 01:44. He briefly zooms in on N.G. as J.W. is talking to N.G. *Id.* at 02:00. Appellant apparently places the camera on or near the table. *Id.* at 02:11. F.R. takes the camera and aims it at G.Z. F.R. states, "pink ass nigger" as he pinches his fingers around the image of G.Z.'s head on the camera. *Id.* at 02:24; *see also* Aff. of Probable Cause, 5/1/14, at 2. The recording ends.

Additionally, the juvenile court received the following testimony. A school guidance counselor spoke to F.R. after the incident and testified that F.R. denied choosing the victims of the "smack cam." F.R. told the guidance counselor that "the kid who filmed the video"—presumably referring to Appellant—selected them, "probably because they were white [and] they are pussies." *Id.* at 117, 119.

Detective Bill Williams described his investigation, identified the parties on the recording, narrated portions of the events depicted, and opined that the term "pink" was a pejorative term for a Caucasian. The detective authenticated Appellant's and J.W.'s handwritten apologies,[2] which were entered into the record.

Appellant's statement, in it's original form, read:

> I know you guys are probably mad at the fact that my friends were making front of you because your race and how different ya'll look from every body else, and when one of my friends slaped cam you, and tryed to take you guys phone. I'm sincely sorry for recording and provicing the situation because if someone do the same thing to me I would be mad especially if someone was recording. But when I came over and ask to play cards I didn't mean them to come over even though I should have told them to stop I recorded so I'm sorry and I hope ya'll feel generous to accepted my apolgey because when they left and I stoped recording I got to know yall really well.

Commonwealth's Ex. 2.

On redirect examination of Detective Williams by the Commonwealth, the following exchange occurred:

> [Commonwealth]. [E]verybody has asked you about "pink" and they asked you specifically and also about in your affidavit of probable cause because you addressed the issue of "pink" in your affidavit. Is that correct?
>
> [Detective Williams]. Yes.

---

[2] J.W. stated, in part, "we saw these boys playing cards we started talking to them then we started making fun of them then a boy came in ask about a smack cam then we chose these boys because they were much smaller than us and looked different from us then we started recording . . ." Commonwealth's Ex. 3.

Q. And, in fact, this is admitted into evidence at this point, so you write that [Appellant], J.[W.] and F.[R.] started making fun of the boy because of their race, statute and appearance such as the glasses they were wearing, they used racial terms like "pink" and Harry Potter looking mother fucker, all parties understood "pink" to be a slang term for a white person. That's in your affidavit of probable cause. Right?

A. Yes.

*Id.* at 99-100.

The detective later clarified to whom he spoke regarding the term "pink". *Id.* at 106.

[T]he reference -- when I spoke with [Appellant], he explained that there was a pretext to this event that was not captured on the video and it was that pretext of this event where the boys were selected for what was going to happen to them and then among that selection criteria was the comments of the Harry Potter looking person, the reference to "pink" and that was explained as a racial term and set in the context of as the subsequent video supported that everybody knew what was about to happen and why. And that is why I framed it in that context.

*Id.* The detective, in his affidavit of probable cause, previously indicated that Appellant and J.W. "said they selected the victims because they looked different, appeared weak, and were white."[3] Aff. of Probable Cause at 2.

---

[3] The detective also authored a supplemental offense report that indicated Appellant, J.W., and F.R. "started cutting on the boys because of their race, stature and appearance such as the glasses they were wearing" and used racial terms like "pink" and "Harry Potter looking motherfucker." Supplemental Report, 5/1/14, at 3. That incident allegedly occurred before the F.R. took G.Z.'s phone and before the video recording.

- 5 -

The Commonwealth, in closing arguments, asserted all three juveniles, F.R., J.W., and Appellant, attributed their involvement in the incident to race, noting in relevant part that C.W. stated that "his friends were making fun of you because of your race . . . ." N.T. at 175. In discussing F.R. and J.W., the Commonwealth argued F.R. uttered the slur "pink," emphasized they were "acting out of a desire, a malicious intent towards the race of the two white kids at the table[,]" and noted F.R. and J.W. did not harass G.S., N.G.'s Hispanic friend. *Id.* at 176. Appellant's case, the Commonwealth observed, was "more complicated." *Id.* It argued that Appellant was aware that "something [wa]s going on before this and . . . these guys are being targeted for their race." *Id.* at 177. The Commonwealth argued:

> So, once you know that these kids are getting picked on for being white and you decide to hang around and then you decide to videotape it so we can put it on Facebook so everybody can get a good laugh about it later, you're an accomplice.

*Id.*

The juvenile court adjudicated Appellant delinquent for harassment and ethnic intimidation. With respect to ethnic intimidation, the court determined that "[i]t is clear that [Appellant] acted as an accomplice in the harassment and that he was fully aware that N.G. was selected, at least in part, due to his race." *See* Juvenile Ct. Op., 6/5/15, at 21. Although the majority affirms the adjudication for ethnic intimidation on that basis, I respectfully disagree.

Ethnic intimidation requires proof beyond a reasonable doubt that an individual committed a predicate offense—here, harassment—and did so "with malicious intention." *See* 18 Pa.C.S. § 2710(a); ***Commonwealth v. Sinnott***, 30 A.3d 1105, 1111 (Pa. 2011). "'Malicious intention' means the intention to commit any act, the commission of which is a necessary element of [the predicate offense] **motivated by hatred** toward the race, color, religion or national origin of another individual of group of individuals." 18 Pa.C.S. § 2710(c) (emphasis added). The required "racial animus" need not be the sole motivation for the commission of the act, and once established, its existence "cannot be negated by establishing that a second intent coexisted in the mind of the actor." ***Sinnott***, 30 A.3d at 1110.

The Pennsylvania Crimes Code defines accomplice liability as follows:

> **(b) Conduct of another.—**A person is legally accountable for the conduct of another person when:
>
> > (1) acting with the kind of culpability that is sufficient for the commission of the offense, he causes an innocent or irresponsible person to engage in such conduct;
> >
> > (2) he is made accountable for the conduct of such other person by this title or by the law defining the offense; or
> >
> > (3) he is an accomplice of such other person in the commission of the offense.
>
> **(c) Accomplice defined.—**A person is an accomplice of another person in the commission of an offense if:
>
> > (1) **with the intent of promoting or facilitating the commission of the offense**, he:

> (i) solicits such other person to commit it; or
>
> (ii) aids or agrees or attempts to aid such other person in planning or committing it; or
>
> (2) his conduct is expressly declared by law to establish his complicity.

18 Pa.C.S. § 306(b)-(c).

The Pennsylvania Supreme Court has noted that Section 306 is modeled after the Model Penal Code, which has been criticized for its lack of clarity. **See Commonwealth v. Roebuck**, 32 A.3d 613, 621 (Pa. 2011). The Pennsylvania Supreme Court, however, has provided guidance in two decisions regarding accomplice liability: **Roebuck** and **Commonwealth v. Knox**, 105 A.3d 1194, 1196-97 (Pa. 2014).

In **Roebuck**, the defendant participated with others in luring the victim to an apartment complex, where he was ambushed, shot, and mortally wounded. **Roebuck**, 32 A.3d at 614. The defendant did not shoot the victim. **Id.** He was convicted of murder of the third-degree as an accomplice. **Id.** On appeal, the defendant asserted that his conviction was a logical impossibility because:

> accomplice liability attaches only where the defendant intends to facilitate or promote an underlying offense; third-degree murder is an unintentional killing committed with malice; therefore, to adjudge a criminal defendant guilty of third-degree murder as an accomplice would be to accept that the accused intended to aid an unintentional act . . . .

**Id.**

This Court affirmed, holding that the "complicity theory applies in third-degree murder scenarios—even if homicide was not the intended underlying crime—where the intentional acts demonstrate a disregard for human life amounting to malice." *Id.* at 615. The ***Roebuck*** Court granted allowance of appeal.

The ***Roebuck*** Court rejected the defendant's logical impossibility argument, noting:

> Section 306(d) of the Crimes Code directs the focus, for result-based elements, to the level of culpability required of a principal.[4] In the present factual scenario, the purport is to avoid elevating a recklessness-oriented culpability requirement to a purposeful one relative to an accomplice. The policy basis for such treatment is readily discernable,[ ] and a homicide committed with the degree of recklessness predicate to murder provides a paradigmatic example.

*Id.* at 621.

Thus, the ***Roebuck*** Court concluded that with respect to "results" accomplice liability could be sustained based upon "recklessness" as to the result. *Id.* However, the Court further suggested that an individual must be

---

[4] Section 306(d) states:

> **Culpability of accomplice.—**When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.

18 Pa.C.S. § 306(d).

- 9 -

an "accomplice to the conduct," *i.e.*, "aids another in planning or committing the conduct with the purpose of promoting or facilitating it." ***See id.*** at 620 (discussing the Model Penal Code). The Court observed that "the interconnection between accomplice *mens rea* and the mental state required of a principal actor represents an important restraint on accountability. In terms of such limiting principles, it is also necessary to determine whether the principal has taken actions beyond those that the accomplice intended." ***Id.*** at 619 n.11.

In ***Knox***, the Pennsylvania Supreme Court again expounded on the scope of accomplice liability. In that case, the defendant was unarmed when he and his identical twin brother approached a vehicle. ***Commonwealth v. Knox***, 50 A.3d 749, 752 (Pa. Super. 2012). His brother ordered the driver to "get out" and lifted his shirt to reveal a firearm. ***Id.*** When the driver did not comply, the defendant's brother drew the firearm, aimed it at the driver's head, and eventually fired the weapon as the driver attempted to flee in his vehicle. ***Id.*** The driver was mortally wounded. ***Id.*** Two witnesses identified the defendant and his brother as the perpetrators and specifically identified defendant's brother as the shooter. ***Id.***

The defendant was convicted of second-degree murder and carrying a firearm without a license. Of relevance to this appeal, this Court affirmed

the conviction for carrying a firearm without a license based on co-conspirator and accomplice liability.[5] *Id.* at 757-58.

The Pennsylvania Supreme Court, in *Knox*, granted allowance of appeal to consider the sufficiency of the evidence underlying the defendant's conviction for carrying a firearm without a license, when the defendant did not possess the firearm. *Commonwealth v. Knox*, 68 A.3d 323 (Pa. 2013) (order). Although the *Knox* Court affirmed the conviction based on co-conspiracy liability, it addressed accomplice liability as follows.

> Per the express terms of the Crimes Code,[ ] however, accomplice liability has been made offense-specific. Accordingly, the general rule is that a person is an accomplice of another in the commission of "an offense" if, acting with the intent to promote or facilitate the commission of "the offense," he solicits the other person to commit it or aids, agrees, or attempts to aid the other person in planning or committing it. 18 Pa.C.S. § 306(c). The broader approaches—including the common-design theory and the related precept that an accomplice was liable for all of natural and probable consequences of the principal's actions in the commission of a target offense— were supplanted by the General Assembly with the adoption of the Crimes Code and its incorporation of core restraints on criminal liability taken from the Model Penal Code. *See generally Commonwealth v. Roebuck*, 612 Pa. 642, 651-56, 32 A.3d 613, 618-22 (2011) (discussing the interrelationship between the culpability provisions of the Crimes Code and the Model Penal Code in terms of the treatment of accomplice liability).

---

[5] In *Knox*, this Court also affirmed the conviction for second-degree murder, but vacated the then-mandatory life sentence for second-degree murder based on *Miller v. Alabama*, 132 S. Ct. 2455 (2012). *Knox*, 50 A.3d at 752.

In particular, the salient terms of Section 306 of the Crimes Code ("Liability for conduct of another; complicity") are derived from Section 2.06 of the Model Penal Code, which expressly rejected the expansive common-design and natural-and-probable-consequences doctrines, refocusing liability for complicity squarely upon intent and conduct, not merely results. *See* AMERICAN LAW INSTITUTE, MODEL PENAL CODE AND COMMENTARIES § 2.06 cmt. 6(b), at 312 (1985) ("[T]he liability of an accomplice ought not to be extended beyond the purposes that he shares.  Probabilities have an important evidential bearing on these issues; to make them independently sufficient is to predicate the liability on negligence when, for good reason, more is normally required before liability is found.").[ ]  After the passage of the Crimes Code, status as an accomplice relative to some crimes within a larger criminal undertaking or episode no longer *per se* renders a defendant liable as an accomplice for all other crimes committed.  *See Commonwealth v. Flanagan*, 578 Pa. 587, 607–08 & n. 11, 854 A.2d 489, 501 & n. 11 (2004).  Rather, closer, offense-specific analysis of intent and conduct is required.[ ]

*Knox*, 105 A.3d at 1196-97.  *Knox* thus emphasized accomplice liability as requiring a "focused examination," which in that case required a determination regarding whether the defendant, "acting with the intent to promote or facilitate his brother's unlicensed carrying of a concealed firearm, solicited his brother to commit such offense or aided, agreed, or attempted to aid his brother in doing." *Id.* at 1197 (citation omitted).

Lastly, with respect to culpability, the Crimes Code provides:

(1) A person acts intentionally with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or a result thereof, **it is his conscious object to engage in conduct of that nature** or to cause such a result; and

- 12 -

> (ii) if the element involves the attendant circumstances, **he is aware of the existence of such circumstances or he believes or hopes that they exist**.
>
> (2) A person acts knowingly with respect to a material element of an offense when:
>
> > (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and
> >
> > (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S. § 302(b)(1)-(2) (emphasis added).

The parsing of an offense into elements ("conduct," "attendant circumstances," and "result") and applying the concepts of culpability ("purposeful," "knowing," "reckless," and "negligent") to each element is sometimes a difficult task. *See Roebuck*, 32 A.3d at 620. Instantly, as to harassment, the conduct is the "strik[ing]" or "engag[ing] in a course of conduct or repeatedly commit[ting] acts which serve no legitimate purpose[.]" *See* 18 Pa.C.S. § 2709(a)(1), (3). "Culpability" for harassment is the "intent to harass, annoy or alarm another." *Id.* As to ethnic intimidation, the conduct is the commission of a predicate offense, *i.e.*, harassment with "malicious intention." 18 Pa.C.S. § 2710(a). The "culpability" for ethnic intimidation refers to two mental states: (1) "the **intention** to commit any act," which is an element of the predicate offense,

and (2) the act be "**motivated by hatred**" toward race. *Id.* § 2710(c) (emphasis added).

Instantly, I agree that the record, when read in a light most favorable to the Commonwealth, established that Appellant acted with an intent to promote or facilitate the harassment of N.G. After F.R. recorded J.W. striking N.G, Appellant moved from his seat at N.G.'s table and took F.R.'s cellphone to record the incident. F.R. stated he was going to "jack" N.G. or G.Z.'s cellphones. Appellant continued to record as J.W. and F.R. lingered around the table and then confronted N.G. and G.Z. anew. Appellant giggled as F.R. teased N.G. about his hair and F.R. and J.W. asked N.G. and G.Z. for their cell phones. Read in a light most favorable to the Commonwealth, this evidence establishes an intent to promote the harassment.

However, because an accomplice must have a "conscious object" to promoting or facilitating the principal offense, I do not agree a finding Appellant was "fully aware" of his cohorts' alleged malicious intent is sufficient to sustain the conviction. Such a finding expands accomplice liability beyond the "conscious object" standard and would apply a broader "knowing" standard with respect to the nature of the conduct of the principal offense, or transform the malicious intent element from a specific state of mind to an "attendant circumstance." *See* 18 Pa.C.S. § 302(b)(1)-(2).

I acknowledge that Detective Williams and F.R.'s statements suggested that Appellant was involved in the selection of the victims based on race. However, the juvenile court did not find that Appellant planned or agreed to aid his cohorts in their racial animus, nor is there any indication the court credited or weighed those statements in reaching its findings.[6]

Thus, I respectfully dissent from the decision to affirm the adjudication of delinquency for ethnic intimidation.

---

[6] Although there was evidence that Appellant stopped recording before F.R. uttered the slur "pink" and some indication that Appellant sat down at the table after the incident and stayed with N.G., the juvenile court did not discuss or render a finding on that evidence. *See* Commonwealth's Ex. 2 (indicating C.W. apologized, in part, because "when they [F.R. and C.W.] left and I stoped recording I got to know yall really well.") Therefore, such evidence does not affect this review of the sufficiency of the evidence. *See In re C.R.*, 113 A.3d 328, 333-34 (Pa. Super. 2015).